*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JOHN K. BOTSON, | ) | Supreme Court No. S-15671 |
| | ) | Court of Appeals No. A-11192 |
| Petitioner, | ) | |
| | ) | District Court No. 3AN-10-11042 CR |
| v. | ) | |
| | ) | O P I N I O N |
| MUNICIPALITY OF ANCHORAGE, | ) | |
| | ) | No. 7077 – January 15, 2016 |
| Respondent. | ) | |
| | ) | |

Petition for Hearing from the Court of Appeals of the State of Alaska, on appeal from the District Court of the State of Alaska, Third Judicial District, Anchorage, Brian K. Clark, Judge.

Appearances: Brent R. Cole, Law Office of Brent R. Cole, P.C., Anchorage, for Petitioner. Seneca A. Theno, Municipal Prosecutor, and Dennis A. Wheeler, Municipal Attorney, Anchorage, for Respondent.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

BOLGER, Justice.
FABE, Chief Justice, dissenting.

## I.     INTRODUCTION

John Botson was arrested for driving under the influence. According to a breath test, his blood alcohol level was .141. The police officer informed Botson of his

constitutional right to an independent chemical test, which Botson declined. But unbeknownst to Botson and the police officer administering the test, the breath test device had produced an error code related to one of its quality assurance mechanisms.

Botson argues that his breath test result was inadmissible under the Anchorage Municipal Code, which requires breath tests to be conducted in compliance with methods approved by the Alaska Department of Public Safety. He also argues that suppression was required under the Due Process Clause of the Alaska Constitution because his ignorance of the error code prevented him from knowingly and intelligently waiving his constitutional right to an independent chemical test. But although the administration of Botson's breath test may not have strictly complied with approved methods, Botson does not contest the district court's finding that the error code had no bearing on the accuracy of the test. Accordingly, we agree with the district court's and the court of appeals' conclusion that the breath test result was admissible under our "substantial compliance" doctrine. We also agree that Botson validly waived his right to an independent chemical test because he had a basic understanding of that right before declining the test. We therefore affirm.

## II.    FACTS AND PROCEEDINGS

### A.    John Botson's Arrest And Breath Test

John Botson was arrested for driving under the influence and submitted to breath testing of his blood alcohol concentration. The Anchorage police officer who administered the test explained to Botson that once the breath test device was prepared it would "go through a bunch of self checks [to] make sure it's functioning properly." Following a 15-minute observation period, the officer took Botson's breath sample and

the breath test device produced a reading of .141,[1] significantly higher than the legal limit of .08.[2]

After informing Botson of the result and reading form notices regarding the revocation of Botson's driver's license and seizure of his vehicle, the officer read Botson a notice of his right to an independent chemical test. The officer told Botson:

> You are under arrest for the offense of driving under the influence. In addition to a chemical test of your breath, you have a right to an independent chemical test of your level of intoxication. . . .
>
> You may obtain an independent test one of the following ways. If you wish to have an independent chemical test at municipal expense, we will make arrangements for a sample of your blood to be drawn by qualified personnel at no expense to you. . . . Two, if you wish to have an independent chemical test of your own choosing, you must make your own arrangements for one to be administered within the immediate Anchorage area by a qualified person and you must pay for it yourself. . . .
>
> . . . It is possible that evidence from the independent chemical test sample may be obtained by the municipality through legal processes and used against you.
>
> I cannot give you any other legal or medical advice. If you have any questions, you should ask your legal and health advisors. At this time you must decide whether or not you want to take an independent chemical test.

Botson responded, "No, I guess not."

---

[1] Botson took two breath tests, but the first produced an invalid sample. After the first test, the officer gave Botson further instruction on how to breathe into the machine and administered the second breath test.

[2] *See* Anchorage Municipal Code (AMC) 09.28.020(B) (2010).

At the time neither Botson nor the officer was aware that the breath test device had produced an error code related to one of its quality assurance measures, the "external standard" test. That test involves a canister of compressed ethanol gas, or "alco bottle," connected to the device's testing chamber. Each canister is labeled with a target value that the administering officer enters into the device prior to testing, and the device has a regulator that controls the flow of gas into the chamber.[3]

The breath test device automatically conducts an external standard test both before and after taking a subject's breath sample.[4] The device first adjusts the target value according to barometric pressure. The device's regulator then turns on and a known quantity of ethanol gas from the canister is pulled into the chamber.[5] The device produces a numerical result based on the amount of alcohol detected, and if that result falls within a given range of the target value, the "external standard" test is satisfied. If the result falls outside of this range, the machine will produce an error message reading "standard out of range."[6]

In Botson's case the target value adjusted for barometric pressure was .079 and the pre-sample external standard test produced a result of .080, well within the acceptable range.[7] But the next external standard test, run after Botson's breath sample

---

[3]     ALASKA SCIENTIFIC CRIME DETECTION LAB., BREATH ALCOHOL TESTING PROGRAM MANUAL 26-27 (2015), *available at* http://www.dps.alaska.gov/crimelab/docs/DMT/Breath_Alcohol_Program_Testing_ Manual_DMT.pdf

[4]     *Id*.

[5]     *Id*.

[6]     *Id*. at 35, 37.

[7]     According to the Municipality's expert witness, the acceptable range at this
(continued...)

was taken, resulted in a value of only .018, far below the expected value. The breath test device therefore produced an error message reading "standard out of range." This error message appeared on the device's screen as well as a printout that the officer initialed and dated. But according to the officer, the error message nonetheless went unnoticed.

The Municipality of Anchorage subsequently charged Botson with driving under the influence, noting that his breath test revealed a blood alcohol level of .141.

## B. The Trial Court Proceedings

Botson filed two suppression motions before the district court, both highlighting the failure of the final external standard test and the resulting error code.

Botson's first motion was based primarily on AMC 09.28.023(E), which states, "To be considered valid under the provisions of this section, the chemical analysis of the person's breath or blood shall have been performed according to methods approved by the state department of public safety." The district court held a two-day evidentiary hearing at which the officer and two expert witnesses testified. The officer explained that at the end of the test sequence, a prompt appears on the breath test device's screen asking the operator if the external testing canister (the alco bottle) has been turned off, and the operator must input "yes" before the test results can be printed. According to the officer, he "[got] ahead of [himself]" during Botson's test and turned off the alco bottle too early "so [he] could just push the yes button." After listening to an audio recording of Botson's breath test, the officer identified the "clunking" sound of the alco bottle being turned off before the final external standard test was completed.

The Municipality's expert witness, Colleen O'Bryant, confirmed this interpretation of the audio recording and testified that turning off the alco bottle

---

[7]    (...continued)
barometric pressure would have been .069 to .089.

prematurely would have caused the final external standard test to produce a result out of range. She further explained that the calibration of the breath test device had been verified on September 14 and October 7, 2010, and that the device would have been "working properly" on September 30, when Botson was arrested.

Botson presented expert testimony from a retired Anchorage police officer, Donald Mann. Much of Mann's testimony was unrelated to the external standard test,[8] but Mann confirmed based on the audio recording of Botson's breath test that the officer likely shut off the alco bottle prematurely. Mann further opined that this *could* have caused the alco reading to fall significantly below the target value. Reaching a different conclusion from the Municipality's expert, however, Mann testified that regardless of what caused the final external standard test to fail, this error precluded the required assurance of accuracy.

The district court denied Botson's suppression motion, concluding that for purposes of AMC 09.28.023(E), "methods approved by the state department of public safety" referred only to those which the Department had *codified*, rather than "any [statewide] procedure or method that the [Department] instituted or taught." Because neither state statute nor regulation requires external standard testing, the court reasoned, the failure of the final external standard test did not render the test result inadmissible. In the alternative, the court concluded that even if external standard testing *had* been required, the Municipality had substantially complied with applicable protocol. Specifically, the court found that the officer prematurely turned off the alco bottle, that

---

[8]     Specifically, Mann analyzed the audio tone produced by the breath test device during both of Botson's breath tests. Based on his analysis of the audio recording, Mann speculated that the thermistor — which measures air flow into the device's chamber — may not have been functioning correctly. But critically, Mann testified that this air flow issue "ha[d] absolutely nothing to do with the accuracy of the analysis of what[] [was] in the sample chamber."

this caused the final external standard test to fail, and that in light of this "simple" explanation for the error code, the reliability of Botson's test results was not in doubt. Accordingly, the court concluded that the Municipality had proved substantial compliance and that Botson's test result was therefore admissible.

Botson then filed a second suppression motion alleging that the officer's failure to disclose the "standard out of range" error had deprived Botson of his due process right to an independent chemical test, because his waiver of this right was not "knowingly and intelligently made."[9] Botson supported this claim with an affidavit stating that he would have taken a blood test had he known about the undisclosed error. Botson also noted that as a rheumatologist he "[relies] extensively on laboratory testing and instrumentation" and is "familiar with the purpose and need for insuring the accuracy of instruments and machines." He further attested that based on the officer's mention of the breath test device's self-tests, he "assumed . . . [the officer] would tell [him] if the [device] was not functioning correctly."

The district court denied this second suppression motion. Citing *Zemljich v. Municipality of Anchorage*,[10] the court stated:

> [F]or a knowing waiver to occur, it is generally sufficient that defendant is notified of his right to an independent chemical test, is aware that he has been arrested for operating under the influence, and understands that the purpose of the

---

[9]     *See Gundersen v. Municipality of Anchorage*, 792 P.2d 673, 676-77 (Alaska 1990) ("Since a defendant must provide the state with potentially incriminating evidence at the risk of criminal penalties, we hold that due process requires that the defendant be given an opportunity to challenge the reliability of that evidence in the simplest and most effective way possible, that is, an independent test. . . . A defendant's waiver of this due process right essential to a fair trial is valid only if it is knowingly and intelligently made.").

[10]     151 P.3d 471, 476-78 (Alaska App. 2006).

independent chemical test is to obtain evidence of his blood alcohol level.

The court reasoned that Botson knowingly and intelligently waived his right to an independent chemical test under that "basic outline of the law." The district court concluded that as a matter of law, "[t]here is nothing requiring the police to inform a defendant of any particular problems with the [breath test device] prior to obtaining a waiver of an independent chemical test." And even if such disclosure *were* required, the court found as a factual matter that this "would not have changed a reasonable person's analysis of whether or not to obtain an independent chemical test."

The district court held a non-jury trial, at which the Municipality introduced evidence of Botson's breath test sample.[11] Based on this sample and stipulated facts, Botson was convicted of driving under the influence.

C. **The Court Of Appeals' Decision**

Botson appealed, and the court of appeals affirmed Botson's conviction.[12] The court first noted that the government is not required to "show absolute compliance with breath test procedures" to introduce a breath test result; rather, "substantial compliance is sufficient."[13] In determining whether the government has shown substantial compliance, the court defined the relevant inquiry as "whether the government's departure from normal procedures affected the reliability of the breath test."[14] Based on the district court's finding of reliability — which Botson did not

---

[11] *Botson v. Municipality of Anchorage*, A-11192, 2014 WL 4050588, at *1 (Alaska App. Aug. 13, 2014).

[12] *Id*. at *5-6.

[13] *Id*. at *2.

[14] *Id*.

challenge — the court of appeals upheld the district court's conclusion "that the error in the administration of the second [external standard] test did not invalidate Botson's breath test result."[15]

In addressing Botson's constitutional claim, the court of appeals first summarized its past decisions on knowing and intelligent waiver, stating that "an arrestee cannot knowingly and intelligently waive the right to an independent test if he does not have a 'basic understanding' of the right to an independent test."[16] The court further noted that

> [a]n arrestee acquires a "basic understanding" of that right if he is "notified of the right to an independent test, is aware that he or she was arrested for driving under the influence, and generally understands that the purpose of the independent test is to obtain evidence of his or her blood alcohol level."[17]

The court concluded that Botson had acquired this "basic understanding" of his right to an independent chemical test.[18]

Chief Judge Mannheimer dissented, concluding that Botson could not make an informed decision about whether to exercise his constitutional right to an independent test absent knowledge of the error message.[19] He noted that the majority's position may be consistent with *Crim v. Municipality of Anchorage*, where the court of appeals held

---

[15]     *Id.*

[16]     *Id.* at *4 (quoting *Crim v. Municipality of Anchorage*, 903 P.2d 586, 588 (Alaska App. 1995)).

[17]     *Id.* (quoting *Zemljich v. Municipality of Anchorage*, 151 P.3d 471, 475 (Alaska App. 2006)).

[18]     *Id.*

[19]     *Id.* at *6-11 (Mannheimer, C.J., dissenting).

that an arrestee could validly waive the right to an independent test absent knowledge of his actual breath test result.[20] But Chief Judge Mannheimer concluded that *Crim* had been wrongly decided, reasoning that "[f]or an arrestee to be able to meaningfully choose whether to assert their right to an independent blood test, the arrestee must know more than the general purpose of the breath test and the general purpose of the independent blood test."[21] Characterizing the officer's failure to discover the error message as negligent, Chief Judge Mannheimer concluded that Botson was "deprived — by government action — of a fair opportunity to decide whether to exercise his right to an independent test."[22]

Botson filed a petition for hearing, which we granted.

## III. STANDARD OF REVIEW

When we review an appellate decision of the court of appeals, we independently review the underlying judgment of the trial court.[23]

"We review a denial of a motion to suppress evidence in the light most favorable to upholding the trial court's ruling."[24] Although "[t]he trial court's findings of fact will not be disturbed unless they are clearly erroneous[,] [w]e independently determine whether the trial court's factual findings support its legal conclusions."[25]

---

[20] *Id*. at \*7-8 (citing *Crim*, 903 P.2d at 588).

[21] *Id*. at \*11.

[22] *Id*.

[23] *State v. Hodari*, 996 P.2d 1230, 1232 (Alaska 2000).

[24] *State v. Miller*, 207 P.3d 541, 543 (Alaska 2009).

[25] *Id*. (citation omitted).

"[T]he interpretation of . . . controlling statutes and regulations is a legal question which we review de novo."[26] "When deciding [constitutional] due process claims, we apply our independent judgment, adopting the rule of law that is most persuasive in light of precedent, reason, and policy."[27]

## IV.  DISCUSSION

### A.  The District Court Was Not Required To Suppress Botson's Breath Test Result Under AMC 09.28.023(E).

Anchorage Municipal Code 09.28.023(E) provides:

> To be considered valid . . . , the chemical analysis of the person's breath or blood shall have been performed according to methods approved by the state department of public safety. If it is established at trial that a chemical analysis of breath or blood was performed according to approved methods by a person trained according to techniques, methods and standards of training approved by the state department of public safety, there is a presumption that the test results are valid and further foundation for introduction of the evidence is unnecessary.

Botson argues that because the breath test device produced a "standard out of range" error code during the final external standard test, the Municipality failed to comply with "methods approved by the state department of public safety."

#### 1.  The Municipality did not strictly comply with "methods approved by the state department of public safety."

The quality assurance measure at issue in this case — external standard testing — is not mentioned in any regulations adopted by the Department of Public

---

[26]  *Moody v. Royal Wolf Lodge*, 339 P.3d 636, 638 (Alaska 2014).

[27]  *Alyeska Pipeline Serv. Co. v. State, Dep't of Envtl. Conservation*, 145 P.3d 561, 564 (Alaska 2006) (citation omitted).

Safety (the Department),[28] and the Municipality argues that compliance with Department-approved methods for purposes of AMC 09.28.023(E) should be measured only against *codified* protocol.

As an initial matter, we disagree with the Municipality's assertion that this issue is "settled" under our current caselaw. The Municipality points to three of our cases involving deviations from the Department's breath testing protocol: *Wester v. State,*[29] *Oveson v. Municipality of Anchorage,*[30] and *Keel v. State.*[31] It is true that each of these cases addressed an alleged omission with respect to an expressly codified requirement.[32] But we have never held that for purposes of AMC 09.28.023(E) or the nearly identical language in AS 28.35.030(d), "methods approved by the [Department]" are restricted to those methods outlined in the administrative code. And for the reasons below, we decline to do so here.

The Department's regulations provide guidance on several aspects of breath alcohol testing, including the approval of new breath testing equipment,[33] certification

---

[28]    *See* 13 Alaska Administrative Code (AAC) 63.005-.900 (2010).

[29]    528 P.2d 1179 (Alaska 1974).

[30]    574 P.2d 801 (Alaska 1978).

[31]    609 P.2d 555 (Alaska 1980).

[32]    *See Keel*, 609 P.2d at 558 (evaluating alleged non-compliance with a prior version of 13 AAC 63.100); *Oveson*, 574 P.2d at 803-04 (evaluating alleged non-compliance with a prior regulation requiring the completion of a "Breathalyzer Operational Checklist"); *Wester*, 528 P.2d at 1184 (evaluating alleged non-compliance with a prior version of 13 AAC 63.040(a)(1)).

[33]    13 AAC 63.030.

of breath test operators,[34] and verification of a test instrument's calibration.[35] But as Botson correctly points out, the only guidance "[w]ith respect to the breath test procedure itself" is 13 AAC 63.040, entitled "Procedure for breath test analysis." This section requires that an officer conduct a 15-minute observation prior to breath testing; enter data when prompted by the breath test instrument; and "instruct the [subject] to blow into the mouthpiece until the visual display indicates that a satisfactory sample has been obtained."[36] But the regulations contain no further detail about the operation of the breath test instrument such as quality assurance measures or appropriate responses to error codes.[37]

Instead it appears that the Department has reserved these details for the Scientific Crime Detection Laboratory's Breath Alcohol Program Testing Manual (the Manual). The Manual outlines several troubleshooting steps to be taken in response to a "standard out of range" error code and advises the breath test operator to contact the crime lab if the error message persists. The Manual also describes the external standard testing process, explaining that the test "delivers a known quantity of ethanol to the [breath test device] both before and after the subject sample. The purpose is to ensure the [device] is accurately recognizing and quantitating ethanol concentrations."[38]

---

[34]    13 AAC 63.050(a).

[35]    13 AAC 63.100(a)-(c).

[36]    13 AAC 63.040(a).

[37]    *See* 13 AAC 63.005-.900.

[38]    ALASKA SCIENTIFIC CRIME DETECTION LAB., BREATH ALCOHOL TESTING PROGRAM MANUAL 26 (2015), *available at* http://www.dps.alaska.gov/crimelab/docs/DMT/Breath_Alcohol_Program_Testing_Manual_DMT.pdf.

Testimony at the suppression hearing similarly shed light on the Department's approved protocol. In particular, the officer testified that he should have waited for the breath test device's prompting before turning off the alco bottle (which contains the ethanol gas used in the external standard test) and responded to the subsequent error code by checking the alco bottle or using another machine. The Municipality's expert witness similarly described the appropriate response to the error message produced during Botson's test. But because the officer failed to note the error message on the device's screen and printout, no remedial measure was taken. We therefore conclude that the Municipality failed to strictly comply with Department-approved methods in administering Botson's breath test.

2. **The Municipality substantially complied with "methods approved by the state department of public safety" in administering Botson's breath test.**

As noted above, AMC 09.28.023(E) requires that a breath test be "performed according to methods approved by the state department of public safety." But in applying the analogous provision in state statute,[39] we have held that "where the record demonstrates that the test was properly performed," substantial compliance with approved methods is sufficient to establish admissibility.[40]

In *Wester v. State* we applied this rule to a requirement that the breath tester "observe the subject to be tested for at least 15 minutes immediately prior to testing."[41] We held that although the *tester* may not have personally observed the subject for the entire 15-minute period, observation by the *arresting* officer constituted substantial

---

[39]    *See* AS 28.35.033(d).

[40]    *Oveson v. Municipality of Anchorage*, 574 P.2d 801, 805 (Alaska 1978).

[41]    528 P.2d 1179, 1183-85 & n.21 (Alaska 1974) (quoting former 7 AAC 30.020(2) (1974)).

compliance and that "a rigid standard of proof [as to that] foundational fact is unnecessary."[42]

We reached a similar result in *Oveson v. Municipality of Anchorage*, which involved the omission of a checkmark on a "Breathalyzer Operational Checklist" required under prior regulations.[43] In that case "[t]here was uncontroverted testimony that the step in question was performed despite the failure to check off the box representing that step."[44] As we explained, the omission rendered the usual *presumption* of the test's validity inapplicable but did not automatically render the test results inadmissible.[45] We held that "where there has been substantial compliance with the [checklist provision], and . . . where the record demonstrates that the test was properly performed, the test results are admissible."[46]

In *Keel v. State* we reached the opposite result in considering a former regulatory requirement that a breath test instrument be calibrated by a qualified "instructor."[47] There the state had shown that the breath test device had been calibrated within the requisite time period by a police lieutenant, but had not "inquire[d] further into

---

[42] *Id*. at 1184-85.

[43] 574 P.2d at 803-04 (citing former 7 AAC 30.020 (1976)).

[44] *Id*. at 805.

[45] *Id*. at 804.

[46] *Id*. at 805.

[47] 609 P.2d 555, 557-59 (Alaska 1980) (citing former 7 AAC 30.050(b) (1980)). A similar regulation now requires periodic calibration by the "scientific director" or a "qualified person designated by the scientific director." 13 AAC 63.100(b).

where, when[,] or by whom [the lieutenant] had been 'certified.' "[48] We held that "[t]he state's failure to show that [the lieutenant] was properly qualified, therefore, casts doubt on the accuracy of the calibration and hence on the reliability of the [breath test] result[]."[49]

Here the district court found that despite the deviation from protocol, the accuracy of Botson's test result was not in doubt, and Botson did not challenge the district court's factual findings in either his appeal[50] or his petition for hearing. Even if he *had*, we could not say that the district court's finding of reliability was clearly erroneous.[51] The district court appropriately considered the following evidence: 1) the officer's confirmation after listening to an audio recording of the testing process, that he had turned off the alco bottle prematurely; 2) calibration verification reports from both before and after Botson's arrest; 3) O'Bryant's expert testimony after listening to the audio recording that she could hear the alco bottle being turned off and that this would have caused the error code in question; and 4) the absence of any compelling testimony from Botson's expert witness suggesting that the breath test device was unreliable.

Botson's position would require us to disregard this evidence. He appears to argue that if a deviation from testing protocol could *theoretically* have impacted the accuracy of a breath test result, this precludes the consideration of a "post hoc theory" as to how the test may nonetheless have been accurate. And he argues that the court of

---

[48] *Keel*, 609 P.2d at 558.

[49] *Id*.

[50] *Botson v. Municipality of Anchorage*, A-11192, 2014 WL 4050588, at *2 (Alaska App. Aug. 13, 2014).

[51] *See State v. Miller*, 207 P.3d 541, 543 (Alaska 2009) ("The trial court's findings of fact will not be disturbed unless they are clearly erroneous." (citing *State v. Joubert,* 20 P.3d 1115, 1118 (Alaska 2001))).

appeals mischaracterized the relevant precedent when it stated that "the crucial issue in determining whether there has been substantial compliance is whether the government's departure from normal procedures affected the reliability of the breath test."[52]

But we view the trial court's substantial compliance analysis as consistent with the relevant caselaw, where we have expressly considered the state's evidence in determining whether the deviation from codified protocol undermined the reliability of a breath test. In *Wester* for instance, we concluded that the minor deviation from protocol in the administration of the 15-minute observation period had no impact on the reliability of the test result, in light of testimony that the subject was under continuous observation for the requisite time period.[53] Similarly in *Oveson*, we looked to the state's "uncontroverted" testimony that although the officer had failed to mark one of the boxes on the "Breathalyzer Operational Checklist," he indeed performed the actions described therein.[54] In contrast the government failed to provide such evidence in *Keel*: although it presented testimony *alleging* that its calibrating officer met the requirements for a duly certified "instructor," we noted that stronger evidence was required to establish this foundational fact.[55] In summary, we have never considered the admissibility of a breath test result in a factual vacuum.

Botson attempts to distinguish his case from *Oveson*'s application of the substantial compliance doctrine by characterizing the officer's failure to complete the final external standard check as jeopardizing the "*substantive* purpose of the [breath test device's] self-check" process. But the purpose of the self-check process here, like the

---

[52] *See Botson*, 2014 WL 4050588, at *2.

[53] 528 P.2d 1179, 1183-85 & n.27 (Alaska 1974).

[54] 574 P.2d 801, 804-05 (Alaska 1978).

[55] 609 P.2d 555, 558-59 (Alaska 1980).

purpose of the checklist requirement in *Oveson*, was to ensure that the breath test was accurate.[56] And here as in *Oveson*, the State provided persuasive evidence to show that the breath test device *was* functioning normally and providing accurate readings despite the police officer's failure to strictly comply with statutorily approved methods.[57]

Finally Botson argues that under the relevant caselaw, police officers must " 'substantially comply' with *each* substantive part of the State-approved breath test protocol." But we have never held that "substantial compliance" is required at a particular level of granularity,[58] and we decline to do so now. Imposing such a requirement would likely lead to *less* accurate breath testing because it would provide the Department of Public Safety and local municipalities with the incentive to *reduce* the number of individual safeguards in their testing protocols.

Accordingly, we disagree with Botson's attempt to distinguish his case from *Oveson* and *Wester* based on the significance of the police officer's deviation from protocol. The district court did not err in denying Botson's first motion to suppress.

### B.     Botson Knowingly And Intelligently Waived His Constitutional Right To An Independent Chemical Test.

This court has long recognized an individual's due process right to challenge the results of a breath alcohol test.[59] In *Gundersen v. Municipality of*

---

[56]     *See Oveson*, 574 P.2d at 804-05.

[57]     *Cf. id*. at 805.

[58]     *See, e.g.*, *id*. at 803, 805 (finding substantial compliance despite testing officer's failure to mark the checkbox indicating he had "[g]auge[d] [the] test ampul and insert[ed] [it] in left-hand holder").

[59]     *See Lauderdale v. State*, 548 P.2d 376, 381 (Alaska 1976) ("A denial of the right to [analyze a breathalyzer's components], that is to say, to 'cross-examine' the results of the test, would be reversible error without any need for a showing of

(continued...)

*Anchorage* we explained that "[s]ince a defendant must provide the state with potentially incriminating evidence at the risk of criminal penalties, . . . due process requires that the defendant be given an opportunity to challenge the reliability of that evidence in the simplest and most effective way possible, that is, an independent test."[60]  We further noted that "if the police choose not to preserve a breath sample, due process requires that they give clear and express notice of a defendant's right to an independent test and offer assistance in obtaining one in order to introduce police-administered test results at trial."[61]

"A defendant's waiver of this due process right essential to a fair trial is valid only if it is knowingly and intelligently made."[62]  "We have held that a defendant's waiver of his due process rights is effective despite his intoxication so long as he knew what he was doing."[63]  But we have not further addressed what constitutes effective waiver of the right to an independent chemical test.  The court of appeals has addressed this issue more directly, stating that effective waiver requires

> "a basic understanding of the right to an independent test," which is satisfied if the driver is notified of the right to an independent test, is aware that he or she was arrested for driving under the influence, and generally understands that

---

[59]     (...continued) prejudice." (citing *R.L.R. v. State*, 487 P.2d 27, 44 (Alaska 1971))).

[60]     792 P.2d 673, 676 (Alaska 1990).

[61]     *Id*. at 677.

[62]     *Id*.

[63]     *Id*. (quoting *Thessen v. State*, 454 P.2d 341, 345 (Alaska 1969)) (internal quotation marks omitted).

the purpose of the independent test is to obtain evidence of his or her blood alcohol level.[64]

The court of appeals also has noted that effective waiver "does not require that the driver be able to 'assess[] the potential advantages and disadvantages of availing himself of the right to an independent test.' "[65]

Of the court of appeals' decisions addressing the right to an independent chemical test, only one has held an arrestee's waiver ineffective. That case, *Ahtuangaruak v. State*, involved a defendant with limited English abilities who could not understand the police officer's "lengthy attempt to explain the blood test option."[66] The court of appeals held that because this language barrier prevented the arrestee from gaining a "basic understanding" of his constitutional right to an independent test, due process required suppression of the arrestee's breath test result.[67]

Echoing this characterization of waiver as requiring only "a basic understanding of the right to an independent test,"[68] the court of appeals has upheld a defendant's waiver as valid in every subsequent case.[69] *Crim v. Municipality of*

---

[64] *Zemljich v. Municipality of Anchorage*, 151 P.3d 471, 475 (Alaska App. 2006) (quoting *Ahtuangaruak v. State*, 820 P.2d 310, 311 (Alaska App. 1991)).

[65] *Id.* (alteration in original) (quoting *Crim v. Municipality of Anchorage*, 903 P.2d 586, 588 (Alaska App. 1995)).

[66] 820 P.2d at 311.

[67] *Id.* at 311-12.

[68] *See id.* at 311.

[69] *See, e.g.*, *Wing v. State*, 268 P.3d 1105, 1108 (Alaska App. 2012) (holding waiver effective despite arrestee's argument that she didn't know whether it would be strategic to have an independent chemical test); *Zemljich*, 151 P.3d at 474-78 (holding waiver effective where arrestee declined to make a decision whether or not to invoke the

(continued...)

*Anchorage*[70] is most directly on point. There the court held that a defendant could "knowingly and intelligently" waive his right to an independent chemical test without knowing the results of his breath test in advance.[71] Looking to the "totality of the circumstances," the court noted that the arrestee "appeared to understand the gravity of his situation, that he had been arrested for driving while intoxicated, that the police had taken a sample of his breath for a reading of his alcohol level, and the significance of an opportunity to have an independent test of his alcohol level."[72]

We agree with the conclusion of both the district court and the court of appeals that Botson acquired a "basic understanding" of his right to an independent chemical test, as defined in the caselaw outlined above. And on the facts of this case, we find that this "basic understanding" standard satisfies due process requirements. The circumstances required for a "basic understanding" were all present in the instant case: 1) the officer read Botson a form notice of his right; 2) the intake transcript suggests that Botson understood he had been arrested for driving under the influence; and 3) as the court of appeals correctly observed, "Botson does not dispute that he understood the significance of the breath test and the importance of the opportunity to have an independent test of his blood alcohol level."[73]

---

[69]    (...continued)
right); *Moses v. State*, 32 P.3d 1079, 1084 (Alaska App. 2001) (holding waiver effective despite arrestee's argument that he was unable to understand whether the independent test would work in his favor).

[70]    903 P.2d 586.

[71]    *Id*. at 588-89.

[72]    *Id*.

[73]    *Botson v. Municipality of Anchorage*, A-11192, 2014 WL 4050588, at *4
(continued...)

Botson does not appear to argue that suppression was required under existing precedent. Instead he asks us to adopt the position taken by Chief Judge Mannheimer in his dissenting opinion. Chief Judge Mannheimer opined that *Crim* was wrongly decided and proposed the following rule: "In order to give an arrestee a fair opportunity to decide whether to exercise the right to an independent blood test, the government must be required to apprise the arrestee of *the circumstances that would reasonably bear on the arrestee's decision whether to exercise this right*."[74] For the reasons below, we decline to overrule *Crim* in favor of this alternative framework.

First, we agree with the court of appeals' conclusion that "[t]he [rule] Botson proposes, carried to its logical conclusion, would require the government to show strict compliance rather than substantial compliance with any breath test procedures that govern the actual administration of the breath test"[75] — a result that would be inconsistent with existing precedent that substantial compliance with Department-approved protocol may be sufficient to establish foundation.[76] As the court of appeals reasoned, suppression would be required under Chief Judge Mannheimer's proposed rule

---

[73]    (...continued)
(Alaska App. Aug. 13, 2014).

[74]    *Id*. at *9 (Mannheimer, C.J., dissenting) (emphasis added).

[75]    *Id*. at *5.

[76]    *See Oveson v. Municipality of Anchorage*, 574 P.2d 801, 805 (Alaska 1978) ("[W]here there has been substantial compliance with the 'Breathalyzer Operational Checklist' provision [in then-existing code] and . . . the record demonstrates that the test was properly performed, the test results are admissible under AS 28.35.033(d)."); *Wester v. State*, 528 P.2d 1179, 1184 (Alaska 1974) ("[W]here substantial compliance with the 15-minute provision is established on the record, . . . a prima facie showing of the foundational fact necessary to establish admissibility is satisfied.").

even where *substantial* compliance was present and where the deviation from protocol had no impact on the accuracy of the test.[77]

Botson echoes Chief Judge Mannheimer's contrary conclusion that "a decision in Botson's favor [would not] mean the end of the substantial compliance doctrine."[78] We first note that the rule Botson proposes appears limited to "*observable* irregularit[ies] in the breath testing process,"[79] which would indeed preserve the substantial compliance doctrine in the context of more latent errors, such as deviations from the prescribed process for verifying breath test instruments' proper calibration.[80] But we have never drawn a distinction between observable and latent errors in evaluating the admissibility of breath test results, and decline to do so here.[81] If anything, adherence to protocol may be of heightened importance in the context of errors that are *not* immediately apparent, such as a calibration issue that could cast doubt not only on an individual breath test result, but on a more systemic basis.[82]

In a related vein, Chief Judge Mannheimer suggests that the substantial compliance doctrine would still apply to "flaws which, even if detected and communicated to the arrestee, would not have materially affected the arrestee's decision

---

[77] *Botson*, 2014 WL 4050588, at *5.

[78] *Id*. at *11 (Mannheimer, C.J., dissenting).

[79] *Id*. at *9 (emphasis added).

[80] *See* 13 AAC 63.100(a)-(c).

[81] In *Wester*, for instance, we applied the substantial compliance doctrine to the testing officer's failure to personally observe the subject for the mandatory 15-minute period — an omission that was immediately apparent from the testing process itself. 528 P.2d at 1184-85.

[82] *See Keel v. State*, 609 P.2d 555, 558 (Alaska 1980) (noting that "proper calibration of the breathalyzer is essential to guarantee accurate readings").

concerning whether to demand an independent blood test."[83]  But deciding in Botson's favor would mean that even a flaw not impacting the accuracy of an arrestee's breath test could be deemed to "materially affect[] the arrestee's decision" whether to invoke the right.  Chief Judge Mannheimer maintains that "the issue in Botson's case is *not* the ultimate reliability of the breath test result,"[84] but we fail to see how else an error in the testing process would be relevant to a reasonable person's decision whether to take an independent chemical test.

Botson argues that knowledge of an error that is later proven "harmless" could impact this decision, and Chief Judge Mannheimer correctly points out that "[a]rrestees must make their decision about the independent test on the spot."[85]  Botson contends that the solution is simple:  "require officers to inform arrestees of machine error messages, even if an officer is of the opinion — and a court may later agree — that the error had no effect on accuracy."  But this is not a case where an officer intentionally withheld information about a potential inaccuracy; rather, the officer failed to realize his mistake or notice the resulting error code.  If the mere *specter* of unreliability is sufficient to render a breath test result invalid on constitutional grounds, the effect would be to require strict as opposed to substantial compliance whenever an officer's mistake was only later discovered.

In addition Chief Judge Mannheimer surmises that under *Crim*, "Botson's waiver [would be] valid regardless of whether the officer's failure to inform Botson of

---

[83]      *Botson*, 2014 WL 4050588, at *11 (Mannheimer, C.J., dissenting).

[84]      *Id*.

[85]      *Id*. at *10.

the error message was willful or only negligent."[86]  Similarly Botson argues that a more protective constitutional rule would "provide . . . incentive for officers to pay attention to error messages and appropriately respond to them."  But evidentiary requirements in the Anchorage Municipal Code[87] and its state analogue[88] already operate to prevent the admission of a breath test where an officer's conduct — whether willful or merely negligent — impacts a test's reliability.  These requirements also encourage law enforcement's adherence to Department-approved protocol in the administration of breath tests:  such adherence gives the test a presumption of validity,[89] whereas deviation from established protocol requires the prosecution to present additional evidence of a breath test's accuracy.[90]  An arrestee's *constitutional* right to an independent chemical test is not the only assurance of reliability; evidentiary requirements directly serve this function.

Finally, we address Botson's argument analogizing the right to an independent chemical test to the right to cross-examination.  In *Lauderdale v. State* we analogized an arrestee's "opportunity to test the reliability or credibility" of a breath test

---

[86]  *Id.*

[87]  AMC 09.28.023(E).

[88]  AS 28.35.033(d).

[89]  AMC 09.28.023(E) ("If it is established at trial that a chemical analysis of breath or blood was performed according to approved methods . . . , there is a presumption that the test results are valid and further foundation for introduction of the evidence is unnecessary.").

[90]  *See, e.g.*, *Wester v. State*, 528 P.2d 1179, 1184-85 & n.27 (Alaska 1974) (noting testimony that arrestee had been observed for the requisite 15-minute period, even if not by the testing officer); *Oveson v. Municipality of Anchorage*, 574 P.2d 801, 805 (Alaska 1978) (noting "uncontroverted testimony" that the step omitted from the prescribed checklist had been performed).

with a criminal defendant's constitutional right to cross-examine a witness who testifies against him.[91]  In his dissent here, Chief Judge Mannheimer noted this analogy, stating:

> When a court decides whether the government's failure to make pre-trial discovery [disclosures] adversely affected a defendant's choices regarding the right of cross-examination . . . , we do not simply ask whether the defendant understood (1) that the government's general purpose in presenting the witness's testimony was to secure the defendant's conviction, and (2) that the general purpose of cross-examination is to test the credibility and accuracy of a witness's testimony.
>
> Instead, we examine the undisclosed information to see whether it likely would have affected the defendant's assessment of *whether to exercise* the right of cross-examination.[92]

Undisclosed information can impact any number of a criminal defendant's strategic decisions, *including but not limited to* whether and how to cross-examine an adverse witness.[93]  For this reason, we have indeed held that a failure to make required pre-trial disclosures under Alaska Criminal Rule 16(a) is presumptively prejudicial.[94]

---

[91]    548 P.2d 376, 381 (Alaska 1976); *see* U.S. Const. amend. VI.

[92]    *See Botson v. Municipality of Anchorage*, A-11192, 2014 WL 4050588, at *9 (Alaska App. Aug. 13, 2014) (Mannheimer, C.J., dissenting).

[93]    *See* Alaska R. Crim. P. 16(a) ("In order to provide adequate information for informed pleas, expedite trial, minimize surprise, afford opportunity for effective cross-examination, and meet the requirements of due process, discovery prior to trial should be as full and free as possible consistent with protection of persons, effective law enforcement, and the adversary system.").

[94]    *Bostic v. State*, 805 P.2d 344, 349 (Alaska 1991) ("[W]e conclude that a defendant is presumptively prejudiced when confronted with a Criminal Rule 16(b)(1)(i) violation.").

And when evaluating whether a non-disclosure is prejudicial, we sometimes inquire into whether the withheld information would have affected a party's strategic decisions.[95]

But the test for prejudicial error is not identical to the test for whether a waiver of a constitutional right is knowing and intelligent. In our view, Botson appears to argue that, to make an "intelligent" waiver, the arrestee must be apprised of any information that would promote a strategic decision on whether to take the independent test. But this requirement conflicts with how a waiver is reviewed in other contexts. For example, a waiver of the right to remain silent may be knowing and intelligent "in the sense that there was awareness of the right . . . and a decision to forego that right, but yet not knowing and intelligent in the sense that the tactical error of that decision was not perceived."[96] Similarly here an arrested driver's waiver of the right to an independent chemical test may be effective even if the driver does not understand the full tactical significance of that decision. The constitution does not necessarily entitle a criminal defendant to all information that could conceivably affect his decision to waive his right to an independent chemical test. And we decline to adopt such an expansive rule on the facts of this case.

We also recognize that Botson could have argued a more moderate position: that an arrestee should be provided with any information that would directly bear on the

---

[95]     *See, e.g.*, *id*. at 348 (noting government's non-disclosure led defendant to "commit[] himself to a theory of the case without being put on notice not only that his theory would be rebutted by expert testimony, but that it would be rebutted by someone with whom he had a privileged relationship").

[96]     2 WAYNE R. LAFAVE, JEROLD H. ISRAEL, NANCY J. KING, ORIN S. KERR, CRIMINAL PROCEDURE § 6.9(b) (3d ed. 2007) (footnotes omitted); *see also Blank v. State*, 3 P.3d 359, 364 (Alaska App. 2000) (concluding driver's confession was voluntary even though interviewing trooper did not reveal accident victim had been killed) *rev'd on other grounds*, 90 P.3d 156 (Alaska 2004).

likelihood that the breath test was inaccurate or unreliable.[97] In this case, however, the district court concluded that the error message did not raise any such concerns:

> Complete and accurate knowledge of the event in question . . . would have been that the officer improperly turned the Alco bottle off prior to the last self-test being conducted. The error result from this mistake had no implications regarding the accuracy of the DataMaster test result itself. Objectively speaking, this would not change a defendant's analysis of whether or not to challenge the DataMaster result.

We agree with the district court's conclusion on this issue. Accordingly, we need not wade into how such information, erroneously or willfully withheld, might bear on whether an arrestee knowingly and intelligently waived his right to an independent test.

## V.    CONCLUSION

We therefore AFFIRM the court of appeals' decision affirming Botson's conviction.

---

[97] *See Gunderson v. Municipality of Anchorage*, 792 P.2d 673, 675 (stating that "due process requires that the defendant be given an opportunity to challenge the reliability" of the breath test evidence by requesting an independent test).

FABE, Chief Justice, dissenting.

I disagree with the court's conclusion that John Botson knowingly and intelligently waived his right to an independent chemical test. I do agree with the court's rejection of a rule that would require arrestees to "be apprised of any information that would promote a strategic decision on whether to take the independent test."[1] Such an expansive rule is not constitutionally required. But I depart from the court's analysis when it declines to consider how information about the error message in the administration of the breath test may have borne on Botson's ability to knowingly and intelligently waive his right to an independent test.

Having rejected the broader rule discussed above, the court acknowledges that a "more moderate position" would require the government to provide arrestees "with any information that would directly bear on the likelihood that the breath test was inaccurate or unreliable."[2] But the court declines to reach the question whether this alternative approach to *Crim*'s "basic understanding" test is necessary to ensure effective waiver because it concludes that the error message in this case did not raise any concerns about the accuracy of the test.[3] Because the court concludes that "[o]bjectively speaking," knowledge of the error message "would not change a defendant's analysis" of whether to exercise the right to an independent test, it does not "wade into" a discussion of how knowledge of the error message might have influenced Botson's

---

[1]     Op. at 27.

[2]     Op. at 27-28.

[3]     Op. at 28; *see Crim v. Municipality of Anchorage*, 903 P.2d 586, 588 (Alaska App. 1995).

decision not to obtain an independent test.[4] I disagree that information about the error message would have been irrelevant to Botson's decision at the time of his arrest.

The threshold question in this case is whether knowledge of the error message would have been relevant to Botson's decision-making process had it been available to him at the time of his arrest. The court answers this question in the negative on the ground that "[c]omplete and accurate" information would have assured Botson that the error message did not suggest inaccuracy.[5] But if the officer who administered the breath test had noticed the error message, it is unclear from the record whether he would have known the source of the message and would have been able to guarantee Botson that it did not signify inaccuracy.

We now have the benefit of 20-20 hindsight to conclude that the error message did not necessarily indicate that the test result was inaccurate. But our inquiry does not turn on the correctness of the ultimate determination that the breath test was reliable: It turns on whether Botson's waiver was knowing and whether he had all information directly bearing on the accuracy of the test result before he made his decision. The fact that more complete information relating to the source and effect of the error message was obtained later is not relevant to Botson's knowledge at the time he waived his constitutional right. Only the knowledge and information available to the defendant at the time of his purported waiver are relevant in determining whether his waiver was knowing and voluntary.[6] And the very fact that the police officer made an

---

[4]    Op. at 28.

[5]    Op. at 28.

[6]    *See United States v. Erskine*, 355 F.3d 1161, 1169 (9th Cir. 2004) (holding in the analogous waiver of Fifth Amendment rights under the U.S. Constitution, "[t]he question . . . is not . . . what the record reveals about [a defendant's] understanding . . .
(continued...)

error while administering the test would surely have been relevant to Botson's decision. Knowledge that the police officer had already committed one error, regardless of its ultimate effect on the accuracy of the test, would likely have played a role in Botson's decision whether to request an independent test.

Because I disagree that information about the error message would have been irrelevant to Botson's decision-making process, I would reach the question whether the "basic understanding" test articulated in *Crim* passes constitutional muster. I do not believe that it does.

The requirements for a voluntary, knowing, and intelligent waiver have been discussed extensively by federal and state courts in the context of other constitutional rights, including the right to *Miranda* warnings and the right to counsel. In the context of guilty pleas, we have explained that "waivers of constitutional rights . . . not only must be voluntary but [also] must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."[7]

---

**6**     (...continued)
throughout the different stages of the proceedings . . . but specifically what the defendant understood *at the particular stage of the proceedings at which he purportedly waived his right*." (emphasis in original)); *United States v. Dujanovic*, 486 F.2d 182, 186 (9th Cir. 1973) (noting that in the context of the right to counsel, the "keystone determination" in the waiver inquiry is the "state of mind of the accused or information at hand upon which he *at that time* intelligently waived his constitutional right." (emphasis added)).

**7**     *Wilson v. MacDonald*, 168 P.3d 887, 889 n.10 (Alaska 2007) (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970)) (internal quotation marks omitted); *see also Edwards v. Arizona*, 451 U.S. 477, 482 (1981) ("It is reasonably clear . . . that waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case . . . .' " (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938))); *Johnson*, 304 U.S. at 464 ("The determination of whether there has been an intelligent waiver of right to
(continued...)

I agree with the court that an appropriately protective rule in the context of the right to obtain an independent test would "not necessarily entitle a criminal defendant to all information that could conceivably affect his [or her] decision."[8] But it would require defendants to be informed of "relevant circumstances and likely consequences."[9] So while an effective waiver can occur without access to all information that would help with strategy, arrestees must be informed of information they would need in order to knowingly and intelligently waive their right. Because the right to an independent chemical test is meant to protect defendants from having erroneous results admitted against them at trial,[10] any information regarding the reliability of the test must qualify

---

[7] (...continued) counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.").

[8] Op. at 27. In *Crim*, the court of appeals correctly held a waiver effective when Crim complained that "without knowing the result of his . . . breath test, he could not have assessed the potential advantages and disadvantages of availing himself of the right to an independent test." 903 P.2d 586, 588 (Alaska App. 1995). Similarly, in *Moses v. State*, the court of appeals held a waiver effective when an arrestee claimed his waiver was not knowingly and intelligently made because he did not understand whether the independent test would work in his favor. 32 P.3d 1079, 1083-84 (Alaska App. 2001). Holding otherwise would have contradicted existing precedent and allowed defendants to have evidence suppressed merely because they were unable to predict whether an independent test would work in their favor or to their detriment.

[9] *Wilson*, 168 P.3d at 889 n.10.

[10] As the court recognizes, "due process requires that the defendant be given an opportunity to challenge the reliability of that evidence . . . [by taking] an independent test." Op. at 19. *See also* John P. Ludington, LL.B., *Drunk Driving: Motorist's Right to Private Sobriety Test*, 45 A.L.R. 4th 11, § 2(a) (1986) ("The rationale [behind the right to an independent test] is that denial of such an opportunity amounts to suppression of evidence or at least interference with a motorist's right to obtain exculpatory evidence.").

as "relevant circumstances." At the very least, "relevant circumstances" include those that, at the time of arrest, appear to directly bear on the likelihood of the test's accuracy or inaccuracy.[11]

Here, the fact that the machine issued an error message would have been an important — if not the most important — factor in Botson's assessment of the reliability of the test. There is no question that if the arresting officer had seen the error message but deliberately concealed this fact from Botson, we could not have concluded that Botson knowingly waived his right to an independent test. And the fact that in this case the officer negligently rather than intentionally withheld the information from Botson does not alter this analysis.

For these reasons, I respectfully dissent and would reverse the decision that Botson knowingly and voluntarily waived his right to an independent test.

---

[11] In *State v. Sanchez*, the Arizona Court of Appeals considered a case in which the breath test in question was subsequently determined to be *inaccurate*. 967 P.2d 129, 130-31 (Ariz. App. 1998). The court held that "[t]here was no knowing, intelligent, and voluntary waiver of [the arrestee's] right to obtain an independent test" because "[t]he blood test was obviously declined because he believed that he was being offered the opportunity to take another equally valid test." *Id.* at 132. While the test in this case was subsequently determined to be accurate, the relevant question is whether Botson had sufficient information to *assess* the likelihood of its accuracy.