**CONFEDERATED SALISH AND KOOTENAI TRIBES OF the FLATHEAD RESERVATION, Appellants,**

v.

**Mike VULLES and Vladimir Vulles, Appellees.**

**No. 23398.**

United States Court of Appeals, Ninth Circuit.

Jan. 28, 1971.

Richard A. Baenen (argued), of Wilkinson, Cragun & Barker, Washington, D. C., for appellant.

Eugene H. Mahoney (argued), Thompson Falls, Mont., for appellee.

Before CHAMBERS, MERRILL and HUFSTEDLER, Circuit Judges.

HUFSTEDLER, Circuit Judge:

This battle between the Indians and the white settlers began in 1964 when the settlers padlocked a gate across a road, traversing the settlers' property, that the Indians used to reach their tribal lands, and the Indians responded by shooting off the locks. The Indians

are members of the Confederated Salish and Kootenai Tribes of the Flathead Reservation ("Tribes"), appellants; and the settlers are the Vulleses, appellees.

The United States, acting as trustee for the Confederated Tribes, sued to enjoin the Vulleses from obstructing the right of way and to recover lost revenue previously earned by leasing tribal grazing lands. After the court had denied the United States' request for a preliminary injunction, the Tribes intervened as plaintiffs. Judgment was entered in part favorably to the United States and the Tribes and in part favorably to the Vulleses. The Tribes alone appeal from that portion of a judgment denying them the use, as individual members of the Tribes, of a right of way across the Vulles land for the purposes of hunting, berry hunting, or recreation on tribal lands lying beyond the Vulles property.

In 1855, by the Treaty of Hell Gate (12 Stat. 975), the Tribes ceded much of their land to the United States, reserving for their exclusive use and occupancy an area in Montana now known as the Flathead Indian Reservation. In 1904, Joseph Vanderburg, a member of the Tribes, received an allotment of land within the reservation. Ownership of that allotment passed by fee patent to one Gladden in 1927. The Vulleses obtained title in 1951.

The allotment separates one portion of the tribal lands from another designated as Range Unit 5B. Members of the Tribes and others reached the range via the right of way in question, known as the Vanderburg truck trail. The trail has existed in substantially its present location since 1933. In that year, the Bureau of Indian Affairs surveyed the road and made some improvements on portions lying beyond the Vulles land. The road crews took their automobiles and equipment over the trail, including that portion which crossed the Vulles property. In 1937 and 1938 the Civilian Conservation Corps further improved the entire length of the road. From then until the Vulleses blocked the road

in 1964, the Bureau maintained the truck trail.

The Vanderburg truck trail was subjected to a variety of uses after it was improved. The Bureau of Indian Affairs and its employees used it to manage Range Unit 5B. The Bureau maintained the trail, using heavy equipment; it serviced the Vanderburg fire lookout by vehicle; and it managed timber development by vehicle. Other persons also used the trail in conjunction with their activities on Range Unit 5B: private contractors harvested tribal timber with logging trucks and caterpillar tractors, members of the Tribes removed Christmas trees, and lessees of grazing lands drove cattle to the range over the trail.

The successive owners of the Vanderburg allotment have maintained gates at the points where the trail entered and left the property since 1933. Except for a brief period when cattle guards supplemented the gates, users of the trail had to open the gates to enter the Vulles land. The gates were not locked, and for the most part the users closed the gates behind them.

The district court found that the truck trail was used continuously by the United States as trustee for the Tribes from 1933 until 1964. Its use was open, notorious, and nonpermissive. The court further found that there was no open, notorious, and continuous use of the road by the general public and that individual hunters, wood gatherers, and berry pickers made spasmodic use of the truck trail. The presence of the gates denied the use of the road to those members of the public who were not acquainted with the road. The court concluded that the United States had established a right of way by prescription prior to the Vulleses' acquisition of their land, but that members of the Tribes, as members of the general public, had not done so. The court decreed that employees of the United States and the Tribes have the right to use the truck trail for the purpose of managing Range

Unit 5B, including maintaining the trail, leasing grazing rights and moving cattle to the range, and contracting for, or permitting, the harvesting and removal of timber, Christmas trees, and wood. But the order specifically excluded the Tribes from using the Vanderburg truck trail to reach Range Unit 5B for the purposes of hunting, berry picking, or recreation. The Vulleses were granted the same right to exclude members of the Tribes as they had to exclude members of the general public. Also, the Vulleses were permitted to lock their gate if they gave a key to the Bureau of Indian Affairs. Additionally, the United States as trustee was awarded damages for lost grazing revenue.

█ Although the evidence clearly and convincingly supports the court's finding that the United States has a right of way across the Vulles land, the court's finding that the Tribes had not established their independent right to use the Vanderburg truck trail is clearly erroneous in light of the applicable law and the evidence presented.

█ In order to establish a right of way by prescription, the claimant must prove that his use was adverse, open, notorious, exclusive, continuous, and uninterrupted throughout the statutory period. (Scott v. Weinheimer (1962) 140 Mont. 554, 560, 374 P.2d 91, 95; Ferguson v. Standley (1931) 89 Mont. 489, 499–501, 300 P. 245, 249–250.) Continuous use does not mean constant use. Rather, if the claimant used the right of way whenever he desired, without interference by the owner of the servient estate, the use was continuous and uninterrupted. (Kostbade v. Metier (1967) 150 Mont. 139, 143, 432 P.2d 382, 385; Hays v. De Atley (1923) 65 Mont. 558, 561, 212 P. 296, 297–298.) "Exclusive" means that the claimant's right to use the right of way is independent of a like right in another. (Scott v. Weinheimer, *supra*, 140 Mont. at 561–562, 374 P.2d at 95–96.)

The evidence reveals continuous, uninterrupted, exclusive, and adverse use of the truck trail by individual members of the Tribes. Daniel Cole, husband of a tribal member, had worked on the trail in 1936 and testified at the hearing for a preliminary injunction that from 1938 until 1948 the road was used regularly by the public. Elmer Morigeau, who worked on improving and maintaining the road from 1933 until 1947, testified that following the improvements, "quite a few" used the road,[1] that he had used it himself to hunt, that in the fall both members and nonmembers of the Tribes, one or two at a time, used the truck trail to reach the range in order to hunt or gather wood, and that miners used the road to reach a mine located beyond the Vulles land. Orral Lake, employed in the harvesting of tribal timber in the late 1940's testified that he saw Indians and others in vehicles crossing the Vulles land on the truck trail.[2] Alexan-

---

1. Morigeau testified:

"Q Now, these people that were hunting in there, were they all traveling in vehicles; some of them on horseback; on foot?

A Most of them go up in there with vehicles.

Q But you assumed that they got in there on the same road you did?

A Well, I know some of them did."

2. Lake's testimony supported Morigeau's as follows:

"Q Now, during the time that you worked up there, Mr. Lake, did you see persons and vehicles using the Vanderburg Truck Trail from Highway 10A on up through the Gladden place, other than Thornton Logging Company vehicles and people?

A Yes.

Q Do you know who any of these people were?

A Yes. Yes.

Q Who were they? Were they Indians?

A Yes, most of them.

Q And did you see persons other than the Thornton employees and Indians utilizing the Vanderburg Truck Trail from Highway 10A through the Gladden Ranch?

A I believe they were, but I couldn't name them now. A lot of fellows got wood up there.

der Clairmont, a member of the Tribes employed by the Bureau of Indian Affairs, testified that from 1936 until 1958 he himself used the road a dozen times a year, that all tribal members used the road to cut Christmas trees, pick berries, or hunt on the range, and that the general public as well as members of the Tribes used the road to cut and gather wood on the range. Finally, appellee Vladimir Vulles admitted that since 1951 he had seen wood gatherers use the Vanderburg trail without his permission while hunters traveled the road with and without permission.[3] The only conflicting testimony was to the effect that few or no persons used the road for any purposes; the court clearly discredited this testimony when it held that the Government had established its right to use the truck trail to manage the range unit. The failure of the gates to deter tribal traffic confirms the adverse nature of the use.[4]

Our conclusion is reinforced by the court's holding that traffic moving across the Vulles land for the purpose of, or resulting from, the management and development of the range's resources met the requirements of adverse, open, continuous, and uninterrupted use for the statutory period. The purpose of travel does not prescribe the right of way. The character and extent of the use (the type and intensity of traffic) determines the nature and extent of the servitude. (O'Connor v. Brodie (1969) 153 Mont. 129, 138, 454 P.2d 920, 925; State v. Portman (1967) 149 Mont. 91, 423 P.2d 56; Ferguson v. Standley, *supra*, 89 Mont. at 502, 300 P. at 250.) The fact of travel and not the purpose of the travel delimits the right of way; the mode of travel determines the servient estate's burden. Movement over the Vanderburg truck trail established the users' right to utilize the trail independent of the reasons motivating the traffic. Consequently, the court erred in limiting the purposes for which the United States and the Tribes could use the Vanderburg truck trail. The only limitation is imposed by the use made of the right of way during the statutory period; subsequent use cannot exceed the prior burden. The Vulleses do not have the right to exclude members of the Tribes.

That portion of the judgment denying to the members of the Tribes the use of the Vanderburg truck trail for the purposes of hunting, berry picking, or recreation is reversed, and the cause is remanded for further proceedings consistent with the views herein expressed.

Q In other words, it wasn't an unusual occurrence during your employment up there, to see Indians and other persons not employed by the Thornton Lumber Company going up through the Vanderburg Trail through the Gladden Ranch?
A Yes."

3. Vulles testified:
"Q Now, since you have purchased the property in August of 1951, have people gone in there to get wood?
A They have without permission.
Q And have hunters gone in through your property?
A Yes.
Q Did they ask permission, or do they go through there as a matter of right?

A Well, a lot of them did ask permission. Now, when I moved on this place, I couldn't very well keep it locked at the bottom, so I locked it on the upper gate, but I can't see that gate from the house; so oftentimes I did find the lock blowed off of there.

4. The unexplained, open use of a right of way for the statutory period creates the presumption that the use was adverse under claim of right. However, the presence of gates that must be opened by the user is strong evidence of a license to pass over the right of way. (Peasley v. Trosper (1937) 103 Mont. 401, 64 P.2d 109.) Here, the evidence of license was rebutted by Vulles himself. (*See* Scott v. Weinheimer (1962) 140 Mont. 554, 374 P.2d 91; note 3 *supra*.)