The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: <u>October 20, 2022</u>

**No. A-1-CA-38029**

**FELIBERTO ULIBARRI, in his capacity as Trustee of the FELIBERTO AND DOMITILIA ULIBARRI REVOCABLE TRUST, and RONALD ULIBARRI,**

       Plaintiffs-Appellants/Cross-Appellees,

v.

**JEFFERY JESIONOWSKI, YOLANDA M. CANO f/k/a YOLANDA M. MONTANO; KATHERINE LECKRONE; ELENA LAVICTOIRE; TONY ESQUIBEL; CATHERINE ESQUIBEL; CHRISTINA ESQUIBEL; and PAUL ESQUIBEL,**

       Defendants-Appellees,

and

**SJS INVESTMENTS, LLC, a New Mexico limited liability company,**

       Defendant-Appellee/Cross-Appellant.

**APPEAL FROM THE DISTRICT COURT OF RIO ARRIBA COUNTY**
**David K. Thomson, District Judge**

Sommer, Udall, Hardwick & Jones, P.A.
Jack N. Hardwick
Santa Fe, NM

for Appellants

Moses, Dunn, Farmer & Tuthill, P.C.
Joseph L. Werntz
Albuquerque, NM

for Appellee SJS Investment, LLC

# OPINION

**BUSTAMANTE, Judge, retired, sitting by designation.**

{1}    This case presents vexing, but not unusual, issues arising from a dispute between neighboring landowners in rural northern New Mexico. Plaintiffs below (the Ulibarris) claimed that they had easements rights to cross Defendants SJS Investments, LLC's (SJS) property over four dirt trails described as "Roads."[1] The district court tried the matter in a bifurcated proceeding. A jury found that the Ulibarris have prescriptive easements over the four Roads. After the jury trial, the district court held a bench trial to determine the scope of use allowable under the easements. The district court's final judgment adopted the jury verdict as its own regarding the existence of prescriptive easements over the four Roads, described limits on the Ulibarris' use of the Roads, and concluded that, in addition to the prescriptive rights found by the jury, the Ulibarris have easements by estoppel over Roads 1 and 2, and easements by necessity over Roads 3 and 4.

{2}    The Ulibarris appeal, challenging the limits placed on their use of Road 2. SJS cross-appeals, arguing: (1) there was insufficient evidence to support finding a prescriptive easement as to Road 1; (2) the district court erred in

---

[1]*See* Appendix A, which generally depicts the location of the Roads and the various properties relevant to this case and entered as Exhibit 1A.

refusing a jury instruction explaining implied permission in the context of easement law; (3) the district court erred as a matter of law in finding an easement by estoppel as to Roads 1 and 2; and (4) the district court erred in finding prescriptive easements as to Roads 3 and 4. We affirm in part and reverse in part.

**BACKGROUND**

**Procedural Background**

**Parties and Property Ownership**

{3} The Ulibarris include Feliberto and Domitilia Ulibarri, their sons Ronald and Teodoro, and the Feliberto and Domitilia Revocable Trust (the Trust). Between them in various combinations, the Ulibarris own the Ranch headquarters and the Winter Pasture depicted on Appendix A. The Ranch Headquarters—owned by the Ulibarri family since the "late 1800s"—is currently owned by the Trust. The Trust also shares ownership of the southern half of the Winter Pasture with Ronald and Teodoro. Feliberto and Domitilia own the northern half of the Winter Pasture.

{4} SJS is a New Mexico limited liability company. SJS is the only one of the defendants below actively participating in this appeal. SJS purchased the land located between the Ranch Headquarters and the Winter Pasture (the

2

Roybal Property) in August 2013. SJS also entered into a real estate contract to purchase the Leckrone-LaVictoire property in 2013.

{5} Yolanda Cano was named as a defendant below because Road 3 crosses her property at its intersection with U.S. Highway 84. Cano is not participating in this appeal, but it is necessary to include information about her property in order to discuss the merits of the easement by necessity issue raised by SJS.

{6} The properties involved in this case were at one time owned by the United States and passed into private ownership by patent at various times starting in 1891. All of the patents were issued pursuant to the Homestead Act. *See* Homestead Act of 1862, ch. 75, 12 Stat. 392 (1862) (codified at 43 U.S.C. § 177 (1926)) (allowing a homesteader to purchase up to 160 acres of cultivated public lands for a minimal price). A summary of the alienation history of the properties is attached to this opinion as Appendix B. Translated to a narrative format, it reveals the following history.

{7} Private ownership of the northern half of the Winter Pasture originated with a patent from the United States to Juan A. Ulibarri in 1939. Feliberto's mother—Juan's widow—deeded the property to him in 1958. Private ownership of the southern half of the Winter Pasture originated with a patent from the United States to Medardo Sanchez in 1962. Mr. Sanchez's son conveyed the property to Feliberto, Ronald, and Teodoro in 2006.

{8} Private ownership of the Roybal Property originated with three separate patents issued by the United States: the first issued in 1907 to Epifanio Miera, the second issued to Stan Roybal in 1960, and the third issued to Stan Roybal in 1962.

{9} Private ownership of the Leckrone-LaVictoire property derived from a patent issued by the United States in 1921. Private ownership of the Cano property derived from a patent issued in 1891.

**Litigation Proceedings**

{10} The Ulibarris filed their complaint seeking declaratory and injunctive relief, quiet title, and damages less than a year after SJS purchased the Roybal and Leckrone-LaVictoire properties. The complaint alleged that since the 1930s, the Ulibarris have operated a cattle business on the Ranch Headquarters, the Winter Pasture, and on public lands located to the east of their deeded properties, using the Roads to move cattle and equipment as needed to maintain and develop the business. The complaint asserted that their use of the Roads was "adverse, open, notorious, continuous, and uninterrupted . . . with the knowledge or imputed knowledge of the owners of the property," and that no one other than SJS and its managing member "ever interfered with, or threatened to interfere with," the Ulibarris' use of the Roads. And the complaint alleged that SJS had locked the gates on Roads 1, 2, and 4 and had

4

"threatened to prevent the Ulibarris from using Roads 1, 2, 3, and 4, in the manner in which [they] have historically used those roads." The complaint asked for entry of a declaratory judgment that the Ulibarris have "easements by prescription, estoppel, implication, and necessity to use" the Roads. The complaint also requested injunctive relief, quiet title, and damages for trespass and interference.

{11} Nine days after the complaint was filed, the Ulibarris filed a motion for preliminary injunction prohibiting SJS and the other defendants from interfering with the Ulibarris' access to and use of Roads 3 and 4. The motion was assertedly prompted by the placement of a lock on the gate leading to Road 3 at its juncture with U.S. Highway 84. SJS and Cano filed their own motion for preliminary injunction, asking the district court to order the Ulibarris to stop cutting the locks on the gates to Roads 3 and 4. Following limited discovery, the district court held an evidentiary hearing on the Ulibarris' motion and, in October 2014 entered an order granting their motion for preliminary injunction and denying SJS's and Cano's motions. That order appears to have remained in place through the end of the proceedings in the district court.

{12} Litigation in the district court thereafter followed what can be described as the normal course, with the exchange of discovery and battling motions for

summary disposition of various aspects of the case. The district court appears to have denied all of the dispositive motions, and thus they do not merit attention here.[2]

{13}    SJS's motion requesting that the district court conduct a bench trial before submitting any issues to a jury does merit attention because the decision to conduct the jury trial first affected the course of the litigation thereafter, including the district court's final judgment. The case was first set for trial by jury in a scheduling order entered in December 2014. That setting was confirmed in an order entered in May 2015. In November 2015, SJS filed its motion asking the district court to hold a bench trial first, arguing that the Ulibarris' claims for declaratory relief, injunctive relief, and quiet title were all equitable claims with no right to a trial by jury. The district court denied the motion, concluding that the underlying issue as to whether an easement exists presents factual and legal questions most appropriately decided by a jury in the first instance. *See Blea v. Fields*, 2005-NMSC-029, ¶ 5, 138 N.M. 348, 120 P.3d 430. The district court indicated that, once the jury ruled, it would hold a bench trial "regarding relief relating" to the easements.

---

[2]The parties do not raise any issues about the denial of their dispositive motions. In addition, the record does not contain an order denying the Ulibarris' motion for summary judgment on their claim for prescriptive easements and easement by estoppel on all four roads.

6

{14} The pleadings filed leading up to the jury trial reflect the district court's order. The pretrial order included mention of the Ulibarris' claim to easements by prescription, estoppel, and necessity in its claims of the parties section. And, the contested issues of fact section alluded to factual questions relevant to the same three varieties of easement. In addition, the parties' trial memorandums included their legal arguments as to each of the types of easement. Further, the parties' requested jury instructions included language about each of the three types of easements.

{15} Notably, the instructions given to the jury contained no reference to the claims for easement by estoppel or necessity. The two issues were nonetheless actively litigated during the trial, given that they figured in SJS's motion for directed verdict at the close of the Ulibarris' case. The district court denied the motion with regard to easement by necessity as to Road 3 and took the motion under advisement as to Road 4. The district court also took the motion as to easement by estoppel under advisement, stating that it would rule on it before the case was submitted to the jury. The record designated to this Court, pursuant to Rule 12-211 NMRA, provides no indication why the issues of easement by estoppel and necessity were not submitted to the jury, and the parties do not make an issue of it. For purposes of this opinion, we assume

7

that the district court and the parties determined to postpone the decision on these issues to the bench trial.

{16} The jury found in favor of the Ulibarris on their claims for prescriptive easements on all four Roads. The district court entered its judgment on the verdict, noting that it would "conduct further proceedings to determine the scope, width, and location of the prescriptive easements, the equitable relief to which [the Ulibarris] may be entitled, and [the Ulibarris'] claims to establish easements by necessity and easements by estoppel, and any other matters within the [c]ourt's purview."

{17} Following entry of the judgment on the jury verdict, SJS filed a motion for a new trial pursuant to Rule 1-059 NMRA and a motion for judgment as a matter of law pursuant to Rule 1-050(B) NMRA. The motion for new trial primarily argued that there was no substantial evidence to support the jury's award. The district court denied the motion for a new trial with respect to Roads 2, 3, and 4. It took the motion under advisement as to Road 1. The motion for judgment as a matter of law primarily reiterated SJS's prior legal arguments concerning the required elements of easement by estoppel and easement by necessity and why they could not be met in this case. The district court granted the motion with regard to easements by estoppel as to all four

8

Roads, determining there to be no such easements, but took the issue of easements by necessity under advisement again.

{18}    The bench trial was conducted over three days in June 2016. The district court entered an order containing its findings of fact and conclusions of law in May 2018. The final judgment was entered in June 2018. In its final judgment, the district court reversed itself, and—without explanation or reference to its prior contrary order—held that there were easements by estoppel over Roads 1 and 2. The final judgment also held that Roads 3 and 4 were subject to easements by necessity.

{19}    The Ulibarris and SJS filed motions asking to amend or alter certain aspects of the district court's order and judgment. SJS's motion asked the district court to order the Ulibarris to have a survey performed of all four Roads, give notice of the time they would conduct their cattle drives, and for shared daisy chain access through the gate at the intersection of Road 3 and Highway 84. The Ulibarris made the same arguments they make in this appeal with regard to the scope of the Road 2 easement, as discussed below. The district court denied most of the requests, but did order the Ulibarris to give one-week notice to SJS prior to moving cattle on Road 2. It also ordered that a daisy chain be placed on the gate to Road 3. This appeal followed.

**General Factual Background**

{20}   There is little disagreement about many of the facts in this case. The following narrative is drawn primarily from the district court's unchallenged findings of fact.

{21}   The Roads consist of unsurveyed dirt paths in ranching country in a rural area of Rio Arriba County. Road 1 is a cow trail for much of its length, though it coincides in places with dirt roads on the Roybal Property. Road 2 is a dirt road that crosses the Roybal Property in a generally north/south direction connecting the Ranch Headquarters with the northern half of the Winter Pasture. Roads 3 and 4 are also dirt roads that connect the Winter Pasture to Highway 84. Road 3 crosses the Cano and the Leckrone-LaVictoire properties before entering the northern half of the Winter Pasture. Road 4 crosses the Leckrone-LaVictoire property before it reaches the southern half of the Winter Pasture. Without access through the Cano and Leckrone-LaVictoire properties, SJS's lands and the Winter Pasture would be landlocked.

{22}   The Cano and Leckrone-LaVictoire properties have been fenced and enclosed for as long as the Ulibarris can remember, and during the entire time Ronald has used Roads 3 and 4 to access the Winter Pasture. The Roybal Property has been fenced and enclosed for as long as Ronald can remember,

10

and during that entire time he has used Road 1 to drive the Ulibarris' cattle to and from the Carson National Forest—some forty years.

{23} The Ulibarris' use of Roads 1, 3, and 4 is essentially undisputed. The Ulibarris have used Road 1 to move their cattle to and from the Carson National Forest each spring and fall for over forty years. They generally move the cattle to the forest in late June, and back to the Ranch Headquarters in late September. The Ulibarris have used Road 3 since 1939 to access the northern half of the Winter Pasture. And they have used Roads 3 and 4 since 1999 to access the southern half of the Winter Pasture. They have used Road 3 "as needed and without restriction, for various purposes including caring for their cattle, monitoring the property, moving farm machinery, bulldozers, tractors and stock trailers, making improvements, maintaining fences, . . . hunting, and wood cutting." The Ulibarris have also maintained Road 3 over the years.

{24} The scope of the Ulibarris' use of Road 2 over the years is less clear, though the parties do agree that its original use starting in 1939 was for the movement of cattle from the Ranch Headquarters to the Winter Pasture and back, up to four times a year. We will provide more detail concerning the parties' disagreements in our substantive analysis.

11

{25} Similarly, we will provide more detail as to the evidence elicited concerning Stan Roybal's knowledge about the Ulibarris' use of Road 1 while he owned the property.

**DISCUSSION**

**The Ulibarri Appeal**

{26} The Ulibarris' sole argument in their appeal is that the district court improperly narrowed the scope of their prescriptive easement in Road 2. The district court's findings of fact describing what it termed the limited "historic use" of Road 2 are spread between findings of fact numbers 68, 69, and 78.

> 68. The Ulibarris use of Road 2 is essential for the operation of the Ulibarris' cattle business because, if the Ulibarris have to travel between the Ranch Headquarters and the Winter Pasture using Roads 3 and 4 to transport cattle, it would be cost prohibitive to travel, and transport cattle, back and forth between the Ranch Headquarters and Winter Pasture. . . . This is not the case for maintenance of the Southern Pasture. Maintenance of the Southern Pasture, now done by disks, is not a historic use of this easement.

> 69. In late 2013, after the Defendant SJS . . . purchased the Roybal Property, SJS blocked the Ulibarris' access on Road 2 by, among other things, directing Mike Lopez to place a rock pile on Road 2. . . . This is not true regarding maintenance of the land and pasture. The Ulibarris undoubtedly want a shorter route to the Ranch Headquarters; the historic use of the land does not account for such use. The historic use was to move the cattle. [The Ulibarris], however, argue they have a right to use the easement as a corridor between their properties to transport hunters/invitees, maintenance equipment and other non-historic uses. There is no evidence to support such an order.

12

> 78. Road 2 is still too narrow for the Ulibarris to move their disks on Road 2 to the Winter Pasture and may not be used for that purpose.

{27} The district court as a consequence ruled that the Ulibarris could only use Road 2 as "a cattle easement . . . to move cattle back and forth between the Ranch Headquarters and Winter Pasture for one and one-half hours up to four times per year." The district court determined they were allowed to use workers on horseback and ATVs as reasonably necessary to accomplish the task. In addition, the Ulibarris could use Road 2 to "transport wood—twice in the fall and winter." But, if they "wish[ed] to hunt the Winter Pasture . . . they must use the Road 3 easement."

{28} The Ulibarris argue variously that (1) the district court's ruling is not supported by substantial evidence; (2) the district court improperly ignored uncontradicted evidence about their use of Road 2; and (3) the district court's finding of fact number 69 is impossible to harmonize with findings of fact numbers 65 and 66. They ask us both to reverse finding of fact number 69, and modify the final judgment such that the scope of their easement matches findings of fact numbers 65 and 66. The district court's finding of fact number 65 stated, in pertinent part:

> 65. The Ulibarris use Road 2 to travel between the Ranch Headquarters and Winter Pasture in connection with the

13

> Ulibarris use and improvement of the Winter Pasture, and the Ulibarris' cattle business. The Ulibarris, and their invitees, travel upon Road 2 on foot, on horseback, using ATV's and using other vehicles. The Ulibarris, and others who have the Ulibarris' permission, use Road 2, as needed to access the Winter Pasture for various purposes including making improvements, maintaining fences, monitoring the property, and wood cutting. These uses generally take place in the spring, summer, and fall, depending upon the weather and amount of snow on the ground.

{29} Using finding of fact number 65 as a template for the scope of the easement would result in a markedly broader and more frequent use of Road 2 than the district court contemplated.

{30} We review the district court's findings of fact for substantial evidence, viewing the evidence in the light most favorable to support the district court's findings, resolving all conflicts, and indulging all permissible inferences in favor of the decision below. *Jones v. Schoellkopf*, 2005-NMCA-124, ¶ 8, 138 N.M. 477, 122 P.3d 844. While we are deferential to facts found by the district court, we review conclusions of law de novo. *Benavidez v. Benavidez*, 2006-NMCA-138, ¶ 21, 140 N.M. 637, 145 P.3d 117. In addition, the Ulibarris remind us that "when a district court makes specific written findings of fact that are supported by substantial evidence, those findings prevail over any inconsistent conclusions of law or inconsistent judgment." *Id.* (alterations, internal quotation marks, and citation omitted); *see Wilson v. Richardson Ford Sales, Inc.*, 1981-NMSC-123, ¶ 7, 97 N.M. 226, 638 P.2d 1071 ("[W]hen

14

the facts are not in dispute and a reasonable inference can be drawn, an appellate court may independently draw its own conclusions and overrule contrary conclusions made by the [district] court.").

{31}     We start the analysis with the law describing how the scope of use of a prescriptive easement is determined. We then measure the evidence in the record against the district court's findings of fact in light of the legal guidelines. And, finally, we consider if there is any remedy we can provide other than reversal and remand.

{32}     The general rule is that the extent—or scope—of a prescriptive easement is established by its historical usage. *Maloney v. Wreyford*, 1990-NMCA-124, ¶ 15, 111 N.M. 221, 804 P.2d 412 (citing *Twin Peaks Land Co. v. Briggs*, 181 Cal. Rptr. 25, 28 (Ct. App. 1982)). Determining historical usage involves proof of the use made during the prescriptive period. *Confederated Salish & Kootenai Tribes of Flathead Rsrv. v. Vulles*, 437 F.2d 177, 180 (9th Cir. 1971). As the court in *O'Dell v. Stegall*, 703 S.E.2d 561, 591 (2010) put it, "The entire history of the claimant's usage of the way over which an easement is sought must be evaluated to determine the character and scope of the prescriptive easement."

{33}     Once set, however, variations in usage will predictably occur, and questions can arise as to whether the variation is permissible. Courts generally

analyze "whether a specific use is within the pattern of the establishing uses" by considering "(1) their similarity or dissimilarity of purpose; (2) their respective physical attributes; and (3) the relative burden caused by them upon the servient parcel." 4 Michael Allan Wolf, *Powell on Real Property* § 34.13 at 34-154 to 34-156 (2020) (footnotes omitted).

{34} It is not clear what the district court meant when it emphasized that the "historic use" of Road 2 was to move cattle back and forth. Perhaps it meant to convey that cattle drives were the first, establishing use, and that other uses—such as those listed in finding of fact number 65—constituted impermissible variations. We conclude that we do not need to parse the question. Regardless of the district court's intent, the basic issue remains: What uses of Road 2 did the Ulibarris make during the prescriptive period? We now turn to the evidence and the district court's findings of fact.

{35} We first note that the Ulibarris did not request any findings of fact concerning the applicable prescriptive period. And the district court did not define a prescriptive period either. This gap is of no great moment for early uses given the long span of continuous ranching activity on Road 2 described by the Ulibarris—sixty-seven years for Feliberto and forty for Ronald. This span easily covers the time frame when Road 2 passed into private ownership and became potentially subject to prescriptive rights. *See Herbertson v. Iliff*,

16

1989-NMCA-027, ¶ 11, 108 N.M. 552, 775 P.2d 754 (reiterating that prescriptive rights cannot be acquired against the United States). It is potentially more problematic for uses that began or were conducted in later years; in particular in the ten years preceding the purchase of the Roybal Property in 2013. The record is murkier for that time frame, and the district court's findings of fact do not address what adverse uses—if any—may have been conducted in that time frame. The dearth of findings and evidence concerning the start date for some uses will be discussed in more detail when we consider remedy options.

{36} There is no question that the Ulibarris have used Road 2 to move cattle from the Ranch Headquarters to the Winter Pasture since at least the 1950s. The basic pattern set is for two round-trip moves, one in the early spring and another in the late fall. According to Ronald, Road 2 is a "two-track road" usable by "small vehicles . . . Jeeps, [and] four-wheelers." It is not used for "equipment, heavy equipment, [or] pulling trailers." Ronald also testified at the jury trial that he and his father made "25 to 30" trips over Road 2 to do range improvements on the Winter Pasture with tractors and other equipment. He did not specify how long that type of use had gone on. Nor did he expand on what kind of equipment was moved or what type of range improvements were done. At the bench trial, Ronald reiterated that he had used Road 2 to

17

move machinery and tractors, but again did not describe in any detail what kind of machinery he was referring to. Feliberto testified that he first bought a "small tractor[]" for use in the cattle business in 1958 and that he has used Road 2 to get the tractors from the Ranch Headquarters to the Winter Pasture.

{37}     This testimony, which the district court did not directly reject, is sufficient for us to conclude that the ruling limiting the use of Road 2 to moving cattle and prohibiting all vehicular traffic not connected with that activity is not supported by substantial evidence. The easement on Road 2 allows for greater use, but how much greater is not clear. For example, the terms "equipment" and "machinery" can in ordinary usage include heavy tractors, loaders, bulldozers, and farm equipment such as disks and plows. But, other testimony indicates that such equipment has routinely been brought into the Winter Pasture via Roads 3 and 4. Ronald testified that he would not have been able to make improvements such as stock ponds, sagebrush control, green planting, and fencing to the Winter Pasture without the use of Roads 3 and 4. In addition, it is not clear from the record when the improvements requiring heavy equipment were undertaken. The exhibit introduced to prove the contract with USDA covered the years 2013 to 2016. But, there is testimony that the arrangement started ten or twelve years prior to the trials in this case and that the Ulibarris used Roads 3 and 4 to perform the work.

18

{38} The Ulibarris ask us to resolve the matter by simply accepting the district court's finding of fact number 65 and amending the final judgment to match. We decline to do so given the uncertainties as to the actual facts evident in our partial exposition of the record above. It would be more appropriate and efficient to remand to the district court for further proceedings and argument. We contemplate that proceedings on remand will not include new testimony or evidence. This matter has already been the subject of two trials at which the parties had a reasonable opportunity to present all the evidence they deemed appropriate to prove their cases.

{39} We acknowledge that this Court has on occasion corrected district court conclusions of law and ordered entry of a new judgment or order as a matter of law. But, we have done so only in instances where the facts were clear. That is not the case here. In *Wilson*, 1981-NMSC-123, ¶ 7, for example, the events leading to and giving rise to the worker's injuries were undisputed. Similarly, in *Roybal v. Chavez Concrete & Excavation Contractors, Inc.*, 1985-NMCA-020, ¶¶ 8-10, 102 N.M. 428, 696 P.2d 1021, the district court's accurate finding of fact as to the partial loss of use injury suffered by the worker precluded it from ordering payment of 100 percent of the compensation rate.

19

{40}     There are two items of use that should not be subject to reconsideration on remand. First, the district found that "Road 2 is still too narrow for the Ulibarris to move their disks on Road 2 to the winter pasture and may not be used for that purpose." The district court conducted an on-site view of the four Roads prior to the bench trial. It thus had first-hand knowledge about the configuration of the Road. We cannot say that its finding of fact concerning the use of Road 2 to transport the disks is not supported by substantial evidence.

{41}     Second, the district court specifically held that "[i]f the Ulibarris wish to hunt the Winter Pasture (north and south tracts), they must use the Road 3 easement." This ruling impliedly reflects a decision by the district court that the Ulibarris had not proven an easement for hunting access using Road 2. That finding is supported in the record. The evidence concerning hunting is scant for the time period to 2010. Around 2000 Ronald became a licensed outfitter and began using Roads 2, 3, and 4 for his hunting parties. However, he "got" Stan Roybal's hunting permits, and Mr. Roybal gave him permission to use Road 2 and his property for hunting. Given that permission, the Ulibarris could not prove an adverse use supporting a prescriptive easement. *See Algermissen v. Sutin*, 2003-NMSC-001, ¶ 10, 133 N.M. 50, 61 P.3d 176

(holding that to establish a prescriptive easement there must be adverse use of land).

**SJS's Cross-Appeal**

{42} SJS's cross-appeal addresses three issues. First, it asks us to reverse the ruling that Road 1 is subject to a prescriptive easement. It bases its request on a mixture of factual and legal arguments, which we will address separately. Second, it argues that there is no evidence supporting the ruling that Roads 1 and 2 are subject to easements by estoppel. Third, it asserts that Roads 3 and 4 cannot be subject to prescriptive easements given the district court's ruling that the Ulibarris have an easement by necessity over them.

**The Record Supports the Jury's and the District Court's Decisions That the Ulibarris Have a Prescriptive Easement as to Road 1**

{43} In *Algermissen*, our Supreme Court clarified the law of prescriptive easements for New Mexico, consolidating the "elements into a more succinct and less redundant test." *Id.* Per *Algermissen*, "an easement by prescription is created by an adverse use of land, that is open or notorious, and continued without effective interruption for the prescriptive period (of ten years)." *Id.* *Algermissen* expressly relied on the Restatement (Third) of Property: Servitudes Sections 2.16, 2.17 (2000) as its model for this test. *Algermissen*, 2003-NMSC-001, ¶ 10. SJS only addresses the "adverse" and "open or notorious" prongs of the test in its cross-appeal. *See id.*

{44} The first element is adverse use. *Id.* ¶ 11. "An adverse use is a use made without the consent of the landowner. It is also the type of use that would normally give rise to a cause of action in tort." *Id.* The observation in *Algermissen* that adversity can be hard to prove due to the passage of time, *id.*, strikes a chord here in that the original owners of the servient estates—in particular Stan Roybal—were no longer living when the litigation commenced. As noted in *Algermissen*, because of the potential for problems related to proof, the cases have developed a series of presumptions as starting points for evaluation of the evidence presented. *Id.* For reasons unexplained in the record, the presumptions described in *Algermissen* played no role in the trials below. There is no mention of the presumptions in the jury instructions and no mention of them in the rulings issued by the district court following the bench trial.

**Adverse Use Analysis**

{45} SJS advances three separate arguments concerning adverse use. First, it asserts that the use of Road 1 during the time the Bureau of Land Management (BLM) owned the land and before Mr. Roybal purchased the properties was necessarily permissive. As such, it argues, the permissive nature of the use continued absent an express assertion of adversity by the Ulibarris to Mr. Roybal. *See id.*; *Hester v. Sawyers*, 1937-NMSC-056, ¶ 25, 41 N.M. 497, 71

22

P.2d 646. Second, it argues that the neighborhood accommodation exception to the presumption of adversity applies. SJS appears to ground this argument in part on the testimony adduced concerning community attitudes about crossing each other's properties, and as a matter of law based on the fact the lands are large and sparsely populated. We address both to the extent we are able to parse SJS's briefing. And, third, it asserts that the evidence submitted at the trials was not sufficient to support the finding of adversity under the standard of clear and convincing evidence.

**BLM Permissive Use Argument**

{46} SJS's argument that the Ulibarris' use of Road 1 was permissive while the property was owned by the BLM is problematic. SJS initially supports the argument with a citation to *Herbertson*, 1989-NMCA-027, ¶ 11. As the Ulibarris point out, however, *Herbertson* only held that a prescriptive easement cannot be acquired on land owned by the United States. *Id.* That does not necessarily mean that the use of federal lands is as a result permissive. In its reply brief, SJS relies on *Southern Utah Wilderness Alliance v. Bureau of Land Management*, 425 F.3d 735, 741 (10th Cir. 2005), quoting the following language: "If someone wished to traverse unappropriated public land, he could do so, with or without a[] . . . right of way, and given the federal government's pre-1976 policy of opening and developing the public lands,

23

federal land managers generally had no reason to question use of the land for travel." This language is taken from the introductory remarks to a case, *id.* at 740, dealing with the problems flowing from the repeal of a statute—commonly referred to as "R.S. 2477"—passed in 1866 to encourage the establishment of public roads across the western United States. Act of July 26, 1966, ch. 262, § 8, 14 Stat. 251 ("*And be it further enacted*, That the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted."). The statute was repealed by Congress in 1976. Federal Land Policy Management Act of 1976 (FLPMA), Pub. L. No. 94-579 § 706(a), 90 Stat. 2743, 2793 (1976). The FLPMA grandfathered all roads established under R.S. 2477. Pub. L. No. 94-579 § 509(a), 90 Stat. 2743, 2781; *see also* 43 U.S.C. § 1769. This reservation of rights created questions as to the status and scope of use of such roads, and that was the issue discussed in *Southern Utah Wilderness Alliance*, 425 F.3d at 740-42. The case simply does not address the issue before us, and is of no aid to our analysis.

{47}     Further, there is no basis in the record before us to conclude whether Road 1 would or could be considered a "highway" within the meaning of R.S. 2477. And there is no basis in the record to even speculate as to whether the Roybal Properties were "reserved for public purposes" at the time the Ulibarris began using Road 1. *See* R.S. 2477. Thus, there is no basis to

24

conclude that the statute provided permission to the Ulibarris to use Road 1 to move cattle to their Forest Service allotment.

{48} Even if R.S. 2477 did apply, it likely would not help SJS, because the grandfather clause in the FLPMA quoted above could give the Ulibarris a statutory right to continue using Road 1 after the land passed into private hands. In addition, if R.S. 2477 applied to Road 1, it would also apply to the analysis of Road 2, yet SJS concedes that the Ulibarris have a prescriptive easement in Road 2.

{49} In its reply brief, SJS also cites current BLM regulation, 43 C.F.R. § 2804.29 (2022), that describes the kind of activity allowed on public lands without a BLM grant as an applicant for a right-of-way waits for approval. The regulation provides, "You may conduct casual activities on the BLM lands covered by the application, as may any other member of the public. BLM does not require a grant for casual use on BLM lands." 43 C.F.R. § 2804.29(a). Citing 43 C.F.R. § 2801.5(b) (2022), SJS argues that driving cattle would be casual use because it would create a "negligible disturbance to the BLM land." SJS overlooks 43 C.F.R. § 2801.9(a)(6) (2022), which requires a BLM grant for "livestock driveways." This requirement belies SJS's argument entirely.

{50} Given that it is not possible to say that the Ulibarris' use of Road 1 was permissive before it passed into private hands, there is no basis to apply the presumption of continuing permission.

**Neighborhood Accommodation Exception Argument**

{51} As we noted above, there appears to be two aspects to SJS's neighborhood accommodation argument. We address the purely legal assertion first. SJS argues that a presumption of permission should apply here because the lands here were sparsely populated, open and unenclosed privately owned land. *Hester*, 1937-NMSC-056, ¶ 22. The difficulty for this argument lies in the undisputed fact that the Roybal Property has been fenced and gated for as long as Ronald has used Road 1 to move cattle—some forty years. "New Mexico law is clear that the neighbor accommodation exception set forth in *Hester* is inapplicable to fenced land." *Scholes v. Post Off. Canyon Ranch, Inc.*, 1992-NMCA-078, ¶ 9, 115 N.M. 410, 852 P.2d 683; *see Vigil v. Baltzley*, 1968-NMSC-191, ¶ 7, 79 N.M. 659, 448 P.2d 171 ("The property which is traversed . . . although in high, rough country, is not open and unenclosed but, to the contrary is and has been enclosed by a fence during the entire period during which the prescriptive right is claimed to have accrued, and accordingly the rule to be applied is the general one wherein a conclusive grant is presumed, and not the exception where the use is presumptively

26

permissive."). Thus, SJS is limited to a substantial evidence argument, and we now turn to the testimony adduced at the two trials.

**Substantial Evidence Analysis**

{52}     When analyzing a challenge to the sufficiency of the evidence at the trial level, "[t]he appellate court must review the evidence in the light most favorable to the prevailing party, indulging all reasonable inferences in support of the verdict and disregarding all inferences or evidence to the contrary." *State ex rel. Dep't of Hum. Servs. v. Williams*, 1989-NMCA-008, ¶ 7, 108 N.M. 332, 772 P.2d 366. "Even in a case involving issues that must be established by clear and convincing evidence, it is for the finder of fact, and not for reviewing courts, to weigh conflicting evidence and decide where the truth lies." *Id.* "The question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached." *N.M. Tax'n & Revenue Dep't v. Casias Trucking*, 2014-NMCA-099, ¶ 20, 336 P.3d 436 (internal quotation marks and citation omitted). "We will not reweigh the evidence nor substitute our judgment for that of the fact[-]finder." *Id.* (alteration, internal quotation marks, and citation omitted).

{53}     The jury answered, "Yes" to the following special interrogatory with regard to Road 1: "Was the [Ulibarris'] use of Road 1 adverse? (An adverse

use is a use made without the consent of the landowner. It is also the type of use that would normally give rise to a trespass claim)." In addition, the jury answered, "Yes" to the following question on the verdict form: "Have [the Ulibarris] proven by clear and convincing evidence that they have a prescriptive easement over Road 1?" SJS does not argue that the jury instruction defining clear and convincing evidence was unclear or wrong. The normal assumption is that the jury followed the instructions given to it by the district court. *Norwest Bank N.M., N.A. v. Chrysler Corp.*, 1999-NMCA-070, ¶ 40, 127 N.M. 397, 981 P.2d 1215.

{54} The district court adopted the jury's answers to the special interrogatories and the jury verdict as its own finding of fact regarding the existence of a prescriptive easement over the four Roads. In addition, the district court entered the following findings of fact specifically addressing Road 1:

> 47. Feliberto never asked anyone for permission to use Road 1 to drive cattle between the Ulibarri Ranch Headquarters and the Carson National Forest, and no one ever gave permission to Feliberto to use Road 1. At all times, Feliberto understood that he had a right to use Road 1, and did not need permission from anyone. Feliberto often saw Stan Roybal when Feliberto was using Road 1, and Stan Roybal was well aware of the Ulibarris' use of Road 1.

> 48. Ronald never asked anyone for permission to use Road 1 to drive cattle between the Ulibarri Ranch Headquarters and the Carson National Forest, and no one ever gave permission

to Ronald to use Road 1. At all times, Ronald understood that he had a right to use Road 1, and did not need permission from anyone. Ronald often saw Stan Roybal when Ronald was using Road 1, and Stan Roybal was well aware of the Ulibarris' use of Road 1.

{55} The district court's findings track testimony provided by Feliberto and Ronald at the jury trial. The essence of the testimony from Feliberto and Ronald was that they simply assumed—given the Ulibarris' sixty-plus years of using the Roads, including Road 1—that they had established the "right" to continue to use them no matter what the various landowners thought. No evidence was introduced that Mr. Roybal ever gave the Ulibarris permission to use Road 1 or Road 2. The notion of permission was apparently simply not a topic of discussion between them.

{56} Such evidence has been held to be substantial enough to support a finding of a prescriptive easement in at least two New Mexico cases. For example, in *Brannock v. Lotus Fund*, 2016-NMCA-030, ¶¶ 28-29, 367 P.3d 888, the plaintiffs testified that they never sought permission to use the road because they thought that permission was not required. The owner of the servient estate was available to testify in *Bannock*, unlike in this case. *See id.* ¶ 29. The owner's testimony indicated that he "was not concerned with people trespassing on [his] property." *Id.* (internal quotation marks omitted). In addition, he never spoke with the plaintiffs concerning their use of the road

29

until the first lawsuit was filed. *Id.* And in *Silverstein v. Byers*, 1992-NMCA-123, ¶¶ 2-5, 14-17, 114 N.M. 745, 845 P.2d 839, this Court found substantial evidence of adversity based on a long term use of the road even though the parties were neighborly and provided keys to the locks the servient landowners had placed on the gates to their property. *See also Kaufer v. Beccaris*, 584 A.2d 357, 359 (Pa. Super. Ct. 1991) (noting and holding that "absence of objection by the owner to use of the land is not equivalent to a grant of permission by him such as will preclude the acquisition of title to an easement by prescriptive use" (alteration, internal quotation marks, and citation omitted)).

{57} SJS relies on other testimony in the record concerning the local landowners' practice of allowing neighbors to use their lands as passageways for herding cattle from one area to another as well as the cooperative relationship between the Ulibarris and Mr. Roybal. This evidence tends to be contrary to the jury's finding of adversity. But, it cannot be said that it is determinative of the issue. Taken as a whole the evidence provides conflicting views of the parties' actions, understandings, and motivations. None of it requires a ruling in favor of either party as a matter of law. SJS asks us to reweigh the evidence and decide that one side should win. But, the jury found

adversity under appropriate instructions after having reviewed all of the testimony. We will not substitute our judgment for that of the fact-finder.

{58}     The same analysis applies to SJS's argument that the Ulibarris failed to prove that their use of Road 1 was open and notorious. There was evidence that they had used Road 1 for over sixty years to move their cattle to the national forest. There was evidence that the Ulibarris met and spoke with Mr. Roybal when they were using Road 1 for the cattle drive. The jury could reasonably infer that Mr. Roybal—as the owner of a substantial piece of property he fenced—would know of his neighbors' cattle driving routine over his property. The fact that the drive on Road 1 occurred only twice a year is a factor for the jury to weigh in deciding what level of knowledge was reasonably attributable to Mr. Roybal. The jury decided the facts were sufficient to find that the use was open and notorious within the meaning of the law of easements. We have no basis to disagree.

**SJS's Requested Jury Instruction Number 9**

{59}     SJS requested the following jury instruction:

> With regard to [the Ulibarris'] claim of prescriptive easement, you may presume the use of the easement was adverse only if [the Ulibarris] have proven all of the other elements of this claim and if Defendants have not demonstrated they gave [the Ulibarris] express or implied permission to use the easements.

31

> Implied permission to use the easements exists if [SJS] have demonstrated the use of the road began with permission of the owner of the property and that use did not change until after SJS . . . bought the property. A use remains permissive until a distinct and positive assertion is made to the landowner by words or acts that the user of the road claims a right to use the road.

> The burden of establishing the fact of adversity rests upon the person claiming the easement.

The district court did not submit the instruction to the jury. SJS argues that an instruction describing implied permission "was critical because Stan Roybal was deceased, and therefore, SJS could not call a witness to testify about whether the Ulibarris had express permission to use Road 1 once the BLM conveyed the property to Stan Roybal."

{60}   We hesitate to substantively address this issue given what appears to be an absence of preservation in the trial court. *See Hinger v. Parker & Parsley Petroleum Co.*, 1995-NMCA-069, ¶ 32, 120 N.M. 430, 902 P.2d 1033 ("No New Mexico civil case has permitted a litigant to fashion legal objections to jury instructions for the first time on appeal."). The record before us reflects only one discussion between the district court and counsel addressing jury instructions. That discussion was held on February 26, 2016, a few days before the jury trial began. The conversation first reflects the parties' disagreement about whether SJS's requested instruction number 9 accurately reflected *Algermissen* and its discussion about the use of presumptions in

32

these types of cases. The discussion then reflects that counsel were not looking at the same instruction form. At that point the district court begins to ask for more authority, and the colloquy turned to how they will be provided to it. The entire discussion concerning instructions reflected preliminary, pretrial concerns. The district court came to no conclusions and made no rulings on any of the instructions.

{61}   The record thereafter does not include any discussions concerning the jury instructions. If there was a session settling jury instructions before the case was submitted to the jury, we are not privy to it. Thus we do not know why the district court settled on the instructions submitted to the jury, and we do not know the objections, if any, made by the parties to the instructions given. In short, we do not have the basic information that provides the usual grist of jury instruction appeals. *See Sandoval v. Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶ 65, 146 N.M. 853, 215 P.3d 791 ("It is the duty of the appellant to provide a record adequate to review the issues on appeal."). To preserve error in this area, it is necessary to object or tender a correct jury instruction. *Andrus v. Gas Co. of N.M.*, 1990-NMCA-049, ¶ 26, 110 N.M. 593, 798 P.2d 194.

{62} We note that the Ulibarris do not raise lack of preservation in their briefing. Raising the matter on our own, we conclude that the issue was not properly preserved, and we will not address it.

**The Location of Road 1**

{63} SJS argues that the Ulibarris did not sufficiently prove a definite location for Road 1. SJS relies on certain testimony from Ronald conceding that cattle tend to wander as they are driven from one place to another. SJS also points to the testimony of a land surveyor who testified that Road 1 has no fixed and obvious landmarks and is not capable of being surveyed. As noted by the Ulibarris, this argument ignores the testimony provided by Ronald using aerial photography and photographs taken on the ground as to the location of Road 1 as used over the forty years prior to the trial.

{64} The testimony provided by Ronald was apparently sufficient to allow the district court to fashion the description of the route Road 1 takes found in its finding of fact number 30. SJS does not argue that the description is not accurate, or that it cannot be followed on the ground. Nor does SJS argue or cite to any authority that an easement such as Road 1 must be surveyable to be granted or used. We agree with the district court's citation to *Brown & Brown of MT, Inc. v. Raty*, 2012 MT 264, ¶¶ 37-39, 367 Mont. 67, 289 P.3d 156, for its apt description of a "cattle easement."

34

{65}  We conclude there was sufficient evidence to support the district court's description of the location of Road 1 and its use.

**The District Court Erred in Concluding That Roads 1 and 2 Were Subject to an Easement by Estoppel**

{66}  SJS argues that the district court erred in granting an easement by estoppel as to Roads 1 and 2 because there was no evidentiary support for the ruling and because as a conceptual/legal matter the ruling is incompatible with the district court's grant of a prescriptive easement. We agree.

{67}  As both parties note, New Mexico courts have yet to apply and define the contours of easement by estoppel. In an unreported opinion, this court applied the concept as described in the Restatement (Third) of Property: Servitudes Section 2.10 (2000). *See Jaramillo v. Romero*, No. 32,298, mem. op. ¶ 8 (N.M. Ct. App. Sept. 23, 2013) (nonprecedential). This case presents an appropriate opportunity to adopt and apply the Restatement definition:

> If injustice can be avoided only by establishment of a servitude, the owner or occupier of land is estopped to deny the existence of a servitude burdening the land when:
>
> (1)  the owner or occupier permitted another to use that land under circumstances in which it was reasonable to foresee that the user would substantially change position believing that the permission would not be revoked, and the user did substantially change position in reasonable reliance on that belief; or
>
> (2)  the owner or occupier represented that the land was burdened by a servitude under circumstances in which it

35

was reasonable to foresee that the person to whom the representation was made would substantially change position on the basis of that representation, and the person did substantially change position in reasonable reliance on that representation.

Restatement (Third) of Prop.: Servitudes § 2.10. No one asserts that there was an oral promise, grant, or representation by Mr. Roybal that the Ulibarris relied on. Thus, Subsection 2 of the Restatement (Third) of Property: Servitudes Section 2.10 of the definition does not apply.

{68}  The overarching issue in all cases involving easements by estoppel is whether an "injustice can be avoided only by establishment of a servitude." Restatement (Third) of Prop.: Servitudes § 2.10. These cases present equitable issues requiring courts to balance the reasonable expectations and needs of both parties and consider appropriate alternatives to imposing a servitude if possible. Restatement (Third) of Prop.: Servitudes § 2.10. cmt. c, d. As a practical matter, there is no need in this case to impose an easement by estoppel because the district court found that a prescriptive easement exists. As such, the Ulibarris' right to access the Roads is protected and there is no injustice to be avoided.

{69}  The factual issues in cases covered by Subsection 1 of Restatement (Third) of Property: Servitudes Section 2.10 are whether the owner of the property "permitted" another to use the land when it was foreseeable that the

36

other would substantially change her position reasonably relying on the idea that permission would not be withdrawn. This case centers on whether Mr. Roybal gave the Ulibarris permission to use Roads 1 and 2 as contemplated by the Restatement (Third) of Property: Servitudes Section 2.10.

{70}   We note that the district court did not enter a finding of fact that Mr. Roybal gave permission in any sense to the Ulibarris. Rather, the district court's findings are to the contrary. Finding of fact numbers 47 and 72 state that Feliberto never asked for permission to use Roads 1 and 2 and no one ever gave him permission to use them. The district court entered identical findings relating to Ronald's use of the Roads.

{71}   The district court also found that Feliberto and Ronald relied on their belief that their right to use Roads 1 and 2 could not be revoked as they developed their cattle business. These findings do not refer to reliance by the Ulibarris on any act or forbearance on the part of Mr. Roybal. Rather they refer to the Ulibarris' belief that they had the right to use Roads. But "permission" of some sort emanating from the landowner must be present for reliance to be reasonable. There is simply no evidence of any express or implied permission from Mr. Roybal.

{72}   Further, as a conceptual matter, we agree with SJS's argument that to find any type of permission would negate the jury's finding of prescriptive

easements in the Roads. To find an "adverse use," the jury had to find that the Ulibarris' use of the roads was "made without the consent of the landowner," and that the use "would normally give rise to a trespass claim." It is difficult to conceive how a use without consent that constitutes a trespass can be deemed to include or allow any aspect of "permission" as used in Restatement (Third) of Property: Servitudes Section 2.10. We agree with SJS with easements by prescriptions and easements by estoppel are mutually exclusive.

{73}    Citing illustration 5 to Restatement (Third) of Property: Servitudes Section 2.10, the Ulibarris argue that permission can be found if an owner is aware of a use and does nothing to stop it, and that permission to use that would support a finding of estoppel is somehow different from permission that undermines adversity. We disagree. Slicing and dicing the concept of "permission" in this context as the Ulibarris suggest would add another layer of complication to a set of rules that are perhaps already overly opaque. There is simply no reason to try and parse how many angels can dance on the head of this pin.

{74}    In addition, the case from which illustration 5 is drawn does not support the Ulibarris' sweeping assertion. Restatement (Third) of Prop.: Servitudes § 2.10 illus. 5. Illustration 5 is based on *Holbrook v. Taylor*, 532 S.W.2d 763 (Ky. 1976). Restatement (Third) of Prop.: Servitudes § 2.10. There the road

had been used for over twenty years with permission of the landowner—appellants in the case—for use as a mining haul road. *Holbrook*, 532 S.W.2d at 764. In 1965, the appellees built a residence on property adjoining the appellants' property. *Id.* Five years later, the appellants refused the appellees' use of the road. *Id.* at 766. At trial, the parties litigated whether there was an easement by prescription or by estoppel. *Id.* at 764. The homeowners appellees argued that they had a prescriptive easement. *Id.* The trial court ruled that there was no basis to find a prescriptive easement since all uses prior to this were by permission. *Id.* The landowner appellants argued that all uses had been with their permission. *Id.* The trial court took them at their word and held that they could not sit by, watch the appellees build their home, and then five years later, deny them use of the road. *Id.* at 766. *Holbrook* simply does not support the Ulibarris' position.

**The Ulibarris Are Limited to an Easement by Necessity Over Roads 3 and 4**

{75}     SJS argues that once the district court found that the Ulibarris had an easement by necessity over Roads 3 and 4, it was inappropriate, as a matter of law, for it to also recognize and grant an easement by prescription.[3] We agree.

---

[3]SJS also makes a substantial evidence argument, which we do not address given our holding above.

{76}    The issue of easement by necessity has a curious history in this litigation. Before the jury trial, SJS filed a motion for summary judgment arguing that it was not possible for an easement of necessity to arise as to Roads 3 and 4. SJS made a two-step argument. First, it noted that common ownership is a fundamental requirement of a claim for an easement by necessity. *Brooks. v. Tanner*, 1984-NMSC-048, ¶ 25, 101 N.M. 203, 680 P.2d 343. The common owner of the properties was the United States. Second, it argued, that under the ruling in *Leo Sheep Co. v. United States*, 440 U.S. 668 (1979), the United States had no right to an easement by necessity across the land it had patented when it issued the patents to the Winter Pasture. As such its successors could not claim an easement by necessity either. The district court denied the motion on its merits, concluding that *Leo Sheep* did not control under the facts present in this case. Having argued for a ruling granting them an implied easement by necessity in Roads 3 and 4, the Ulibarris continue to defend the ruling on appeal. Having lost in its attempt to dismiss the claim for an easement by necessity, SJS apparently determined it is to its advantage to accept the district court's ruling.

{77}    Easements by necessity are a specie of implied easement. The Restatement describes them as follows:

> A conveyance that would otherwise deprive the land conveyed
> to the grantee, or land retained by the grantor, of rights necessary

40

to reasonable enjoyment of the land implies the creation of a servitude granting or reserving such rights, unless the language or circumstances of the conveyance clearly indicate that the parties intended to deprive the property of those rights.

Restatement (Third) of Prop.: Servitudes § 2.15 (2000). The theories underlying the rule of implication have vacillated over the years. The first rationale in the early common law was that allowing access to otherwise landlocked property was necessary as a matter of public policy to encourage profitable use of land. Restatement (Third) of Prop.: Servitudes § 2.15 cmt. a. The rationale later shifted to incorporate a presumed intent of the parties to allow access. Restatement (Third) of Prop.: Servitudes § 2.15 cmt. a. The two rationales continue to the present in varied formulations. Restatement (Third) of Prop.: Servitudes § 2.15 cmt. a. Regardless of the underlying policy rationale for the rule, the result is the same: A person benefiting from an easement by necessity is endowed with the right to have access to property over the land blocking access to a public highway.

{78}    The right to access landlocked property over another person's land is what prevents the use from being adverse for purposes of establishing a prescriptive easement. *Bino v. City of Hurley*, 109 N.W.2d 544, 546 (Wis. 1961) ("The use of a way of necessity is permissive and not adverse, and cannot constitute the foundation of a prescriptive easement."); *Oyler v. Gilliland*, 351 So. 2d 886, 887-88 (Ala. 1977) (same). The concept is

41

summarized as follows: "As a general rule, no matter how long an easement is used as a way of necessity, such a use cannot be adverse or confer a prescriptive right." 25 Am. Jur. 2d *Easements & Licenses* § 28 (2022). Thus, the authorities seem to require that if an easement by necessity is proven and granted, a prescriptive easement cannot simultaneously be granted over the same road. Given that both parties here agree that an easement by necessity exists over Roads 3 and 4 as a matter of law, we cannot weigh the evidence to determine "which easement is most consonant with the evidence" adduced at the trial. *See Berkeley Dev. Corp. v. Hutzler*, 229 S.E.2d 732, 736 (W. Va. 1976) (holding that the evidence in the case "more directly supports the implied easement than the prescriptive right"), *overruled on other grounds by O'Dell*, 703 S.E.2d at 586 n.28.

{79}     We are fully aware that this holding results in overturning the jury's decision and verdict. It is not a problematic result, however, because the jury was not aware of the possibility of the existence of the easement by necessity. And our ruling is based on a principle of law, not fact. Thus, we are not questioning the decision the jury made under the facts and instructions it was provided.

42

# CONCLUSION

{80} In sum, we: (1) reverse the district court's ruling with regard to the scope of the easement over Road 2 and remand for further consideration in accordance with our ruling above; (2) reverse the district court's grant of an easement by estoppel as to Roads 1 and 2; (3) reverse the district court's ruling that Roads 3 and 4 were subject to a prescriptive easement; and (4) affirm all other rulings in this matter, including that easements by necessity exist over Roads 3 and 4.

{81} **IT IS SO ORDERED.**

_____
**MICHAEL D. BUSTAMANTE, Judge, retired, sitting by designation.**

**WE CONCUR:**

_____
**J. MILES HANISEE, Chief Judge**

_____
**KRISTINA BOGARDUS, Judge**

Appendix A



# Appendix B

The order of alienation for Road 1:

| Property | Legal | Alienation date |
|---|---|---|
| Roybal | N/2 SE/4 – Sec. 10<br>N/2 SW/4 – Sec. 11 | 08/28/1907 |
| Roybal | N/2 SE/4 – Sec 11 | 04/11/1960 |
| Roybal | S/2 S/2 – Sec. 11<br>S/2 SW/4 – Sec. 12<br>SW/4 SE/4 – Sec. 12 | 02/02/1962 |

The order of alienation for Road 2:

| Property | Legal | Alienation date |
|---|---|---|
| Roybal | N/2 SE/4 – Sec. 10<br>N/2 SW/4 – Sec. 11 | 08/28/1907 |
| Roybal | SE/2 SE/4 – Sec 10 | 02/02/1962 |

The order of alienation for Roads 3 and 4:

| Property | Legal | Alienation date |
|---|---|---|
| Cano | SW/4/ NW/4 – Sec. 15 | 12/01/1891 |
| Esquibel | N/2 NW/4 – Sec. 15<br>SE/4 NW/4 – Sec. 15<br>NE/4 SW/4 – Sec. 15 | 07/15/1921 |
| Winter Pasture – N/2 | NW/4 – Sec 14<br>NE/ 4 – Sec. 15 | 08/28/1939 |
| Winter Pasture – S/2 | SE/4 – Sec. 15<br>SW/4 – Sec. 14 | 02/09/1962 |

11

RP- Page 560

45